**Caricia J. FISHER, Appellant,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY; J. Elwood Clements; C. C. Mickelson, Appellees,**

and

**Arlington County; John # # 1, 2, 3, 4 & 5 Doe; Jane # # 1, 2 & 3 Doe; All Deputy Sheriffs or Employees of Arlington County Sheriffs Department, Names Unknown, Defendants.**

No. 81–1596.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 1, 1982.

Decided Oct. 7, 1982.

---

Leonard J. Koenick, Washington, D. C. (Koenick & McMillin, Washington, D. C., Leslie Scott Auerbach, Auerbach & Simmons, Silver Spring, Md., on brief), for appellant.

Claude M. Hilton, Arlington, Va., Donald A. Clower, Great Falls, Va., for appellees.

Before PHILLIPS, MURNAGHAN and SPROUSE, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

This case grew out of an incident in which the plaintiff, Caricia J. Fisher, was arrested by a police officer of the Washington Metropolitan Area Transit Authority (WMATA) for violating a local ordinance prohibiting eating on WMATA trains. Fisher sued WMATA, the arresting officer, and the former sheriff of Arlington County, Virginia, alleging claims under 42 U.S.C. § 1983 and state tort law against WMATA and its police officer for alleged constitutional and statutory violations incident to her arrest and detention by the arresting officer, and under § 1983 against the sheriff for alleged constitutional violation of her privacy rights during her detention in an Arlington County facility for whose operation the sheriff was responsible.

From judgments by directed verdict against her on all her claims Fisher has appealed. We affirm as to the federal claims respecting the arrest and detention by the WMATA police officer and the violation of privacy rights by the sheriff; we remand for first instance disposition of any pendent state claims determined by the district court to be before it.

I

In mid-morning of December 26, 1979, Fisher, age 24, returned by plane to National Airport in Arlington, Virginia, from a Christmas vacation in New York. At WMATA's airport station she boarded a train bound for downtown Washington, D. C. Several minutes after this train left the station, Fisher unwrapped and began to eat several small sandwiches.

WMATA Officer Mickelson, traveling in uniform on the same train, approached Fisher, advised her that she was violating an Arlington County ordinance prohibiting such eating on the train, and directed Fisher's attention to a sign on the same subject several feet away. Despite additional requests from Mickelson that she cease eating, Fisher continued. According to Mickelson, Fisher finished the sandwiches, put the wrapping paper away and told Mickelson to stop bothering her. Mickelson then informed Fisher that he was charging her with violating the ordinance and asked for identification. Fisher produced a temporary identification card issued by her new employer which bore only Fisher's name. At the next stop, Pentagon Station, Mickelson and another WMATA employee gathered Fisher's three bags and escorted her onto the station's platform.

Fisher testified that once on the platform she "passively resisted arrest," at one point lying prone on the floor or across her bags. Mickelson handcuffed and walked a by then cursing Fisher to the station's kiosk. Mickelson had radioed for transportation to carry Fisher to the Arlington County Police Station and an Officer McFarland of the County Police met the two and delivered Fisher to that station; Mickelson followed in a WMATA car.

Upon arrival McFarland escorted Fisher to the booking area. Mickelson informed the deputy sheriff on duty at the desk that he wanted to have booked for eating on the train a woman for whom he had no local address. The deputy directed Mickelson to obtain a warrant from a magistrate located in a nearby office. Mickelson did so. After serving the arrest warrant on Fisher, Mickelson removed the handcuffs, read her the *Miranda* rights, and presented her to the booking desk. At this point, so far as the record reveals, county officials assumed her custody and Mickelson took no further part in maintaining it.

Fisher then refused to answer identification questions put to her by Officer McFarland and the deputy sheriff. She later testified that she did so because she had been advised of the right to remain silent. McFarland unsuccessfully searched her purse for a local address, although he did apparently find a New York driver's license. Finally, when informed that she would be booked and placed in lock-up if she did not provide requested identification information, Fisher answered, according to her own testimony, "Well, I guess you are going to have to go ahead and book me." Fisher was then placed in a holding cell. At about noon the magistrate issued a commitment order instructing that Fisher, "Local Address Unknown," be held until court the next day.

Fisher remained in the holding cell area, from which she made several telephone calls, until approximately 5:00 p.m., when she was transferred to the women's deten-

tion center on the fourth floor of the same building. There she showered, was given a center dress, and placed in a cell. Dinner and magazines were provided and additional calls made on Fisher's behalf. Later that evening Fisher flooded her cell and the surrounding area by stuffing towels into and then repeatedly flushing the cell's toilet. Finally Fisher, who according to her testimony was desperate to see a doctor or psychiatrist, feigned a suicide attempt by hanging, using her brassiere.

Detention center officers then transferred Fisher, wrapped in a sheet or blanket, to an enclosed isolation cell especially adapted for suicidal inmates or detainees. The cell was located in a section of the center housing male inmates. This unfurnished room contained an elevated camera that relayed a closed-circuit picture to a television screen inside a "control room" located among the general population on that floor. The four walls of this room, which contain screens used to monitor different parts of the center, are made of bulletproof glass. Fisher, who was placed in the cell naked except for her underpants, testified that she heard males outside her room making derogatory remarks about her appearance. At trial she surmised that she was seen by means of the monitoring screen in the control room.

Fisher remained in this room for approximately fifteen hours. Some time on the afternoon of the next day, after a transfer back to the women's center, Fisher was ordered released. By this time county officials had contacted Fisher's father in New York and had arranged for Fisher to be discharged to the custody of family friends. Fisher was never prosecuted for violating the ordinance.

Fisher then brought this action against WMATA, Officer Mickelson, and then Sheriff Clements of Arlington County, Virginia in whose facility she was booked and detained.[1] Though her legal claims have been notably lacking in clarity of presentation throughout, we identify them, as presuma-

1. Other defendants, both named and unnamed, were joined in Fisher's action. On this appeal

Fisher has raised no challenge to dismissal of her claims against those defendants.

bly did the district court, as follows. Against WMATA and Mickelson she claimed, under 42 U.S.C. § 1983, violations of fourteenth amendment rights in the course of her custodial arrest and ensuing detention by Mickelson, and, under the pendent jurisdiction, corresponding violations of state tort law. Against Sheriff Clements she claimed, under 42 U.S.C. § 1983, violation of constitutionally secured privacy rights in the course of her extended detention in the Arlington County facility.

At trial, Fisher's evidence consisted of the testimony of five witnesses, including her own and that of Officer Mickelson and Sheriff Clements, who were called as adverse witnesses. Following presentation of plaintiff's case-in-chief which essentially developed the facts above summarized, defendants rested without offering evidence. The district court, by oral bench order, directed verdicts in defendants' favor as to all claims.[2]

This appeal followed. We take the claims in the order above identified.

**2.** The court had earlier denied Fisher's motions for summary judgment against WMATA and Mickelson on her arrest and detention claims, and on trial also denied her motion for directed verdict on those claims. Fisher's challenges to those rulings on appeal are disposed of, so far as the federal claims are concerned, without need for separate discussion, in our affirmance of the district court's grant of directed verdict for defendants on those claims.

**3.** Though both sides erroneously cite to and quote from the state statute as it existed in 1975, we assume that the text in force at the critical time was the cited version as successively amended in 1976, 1978, and 1979. In view of our disposition, the exact form is not critical, but under Fisher's theory the applicable text in relevant part was presumably as follows:

§ 19.2–74. *Issuance and service of summons in place of warrant in misdemeanor case; issuance of summons by special policemen and conservators of the peace.*—A. Whenever any person is detained by or is in the custody of an arresting officer for any violation committed in such officer's presence which offense is a violation of any county, city or town ordinance or of any provision of this Code punishable as a misdemeanor ... the arresting officer shall take the name and address of such person and issue a summons or otherwise notify him in writing to appear at a time and place to be specified in

## II

Fisher's § 1983 claims against Mickelson and WMATA alleging an unconstitutional arrest and subsequent unconstitutional detention by Mickelson are rested solely upon the legal theory that Mickelson's failure to comply with Virginia law respecting her arrest and detention violated her fourteenth amendment rights. She contends that the evidence was sufficient to support a jury finding that Mickelson did not abide by Va.Code § 19–2.74 (1975) which at the time in issue instructed that misdemeanants such as she in this case were to be released with a summons and without further custody unless they refused to sign the summons or unless they were believed unlikely to appear for trial, in which alternative events they were to be taken, following arrest, "immediately" or "forthwith" before a committing officer.[3]

As we understand her specific contention at this point, it is that because as a matter

such summons or notice. Upon the giving by such person of his written promise to appear at such time and place, the officer shall forthwith release him from custody.

. . . .

Any person refusing to give such written promise to appear shall be taken immediately by the arresting or other police officer before the nearest or most accessible judicial officer or other person qualified to admit to bail having jurisdiction, who shall proceed according to provisions of § 19.2–123.

. . . .

Anything in this section to the contrary notwithstanding, if any person is believed by the arresting officer to be likely to disregard a summons issued under the provisions of this section, the arresting officer shall take such person forthwith before the nearest or most accessible judicial officer or other person qualified to admit to bail in lieu of issuing the summons, who shall determine whether or not probable cause exists that such person is likely to disregard a summons.

Notwithstanding the above, if any person is reasonably believed by the arresting officer to be likely to cause harm to himself or to any other person, the officer may take such person before a magistrate or other issuing authority of the county or city in which the violation occurred and request the issuance of a warrant.

of fact she never declined to sign a summons and there was no basis for thinking that she would not appear for trial, her initial custodial arrest as well as her ensuing detention was in violation of state law. Alternatively she apparently contends that if her release on summons was not required so that her custodial arrest was permissible under the circumstances, her right under state law to be taken "immediately" or "forthwith" before a magistrate following her custodial arrest was then violated by Mickelson's failure to do so. By this means she claims that her constitutional rights, vindicable under § 1983, were violated.

For reasons that follow, we hold that these claims—of an unconstitutional arrest followed by an unconstitutional detention by Mickelson—fail legally, irrespective of the sufficiency of the evidence to support them factually. Mickelson's actions in first arresting Fisher and then detaining her in custody until county officers assumed her custody violated no constitutional rights cognizable under § 1983, even if the facts are as contended by Fisher and assuming *arguendo* that they constituted violations of state law.[4]

The constitutional rights asserted by Fisher in these § 1983 claims must be sought ultimately in the fourth amendment as made applicable to state action by the fourteenth.[5] For it is from the "Fourth Amendment and its common-law antecedents" that "the standards and procedures for arrest and detention have been derived." *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 (1974). We take the arrest and detention claims separately and in that order.

### A

█ The fourth amendment standard for arrest is simply "probable cause, defined in terms of fact and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Id.* (citations omitted).

Where, as here, the claimed violation is by state action, binding precedent in this circuit has it that the constitutional standard is not affected by the fact that state law may impose a more stringent arrest standard upon state police officers. *Street v. Surdyka,* 492 F.2d 368 (4th Cir. 1974). "The states are free to impose greater restrictions on arrests, but their citizens do not thereby acquire a greater federal right." *Id.* at 372. Probable cause remains the sole constitutional standard by which this § 1983 claim is to be judged.

4. The underlying theory of the § 1983 claims against WMATA is not apparent from the record. No matter how these claims are construed, however, they were properly rejected as a matter of law. If, as we assume but need not decide, WMATA should be considered a municipal government for § 1983 purposes, it would only be liable for "action pursuant to official municipal policy ... [that] caused a constitutional tort." *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1977). The conduct charged to Mickelson here is not of that type, indeed is alleged to be illegal under state law and necessarily, therefore, at odds with WMATA policy. WMATA would not in consequence be liable as a municipal government for this conduct either vicariously, *id.* at 691–94, 98 S.Ct. at 2036–2037, or directly for failure adequately to supervise or control it. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

If for some reason not readily apparent to us WMATA should not be considered a municipal government for § 1983 purposes, it still would not be liable vicariously for Mickelson's conduct, *see Vinnedge v. Gibbs,* 550 F.2d 926 (4th Cir. 1977), even if Mickelson were found liable.

As to WMATA's exposure to liability on the pendent state claims, see Part IV, *supra.*

5. Without directly adverting to the fourth amendment as the ultimate source of the claimed right, Fisher on appeal relies specifically upon the fourteenth amendment's due process clause and the eighth amendment's bail clause. The theory—not elaborated—is presumably that the right to have bail set in non-excessive amount also includes the right to have it set without unreasonable delay resulting from post-arrest detention. Without deciding whether any such separate durational right exists, *see Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1974), we need only say that in any event it could only be co-extensive with the more fundamental fourth amendment durational right that we find not violated here. To the extent the claim is that Mickelson's specific conduct caused a total deprivation of her right to bail—not merely a delay in its setting—it is patently without merit.

■ Here the evidence indisputably disclosed that Mickelson had probable cause—tested by the constitutional standard—to believe that Fisher had committed a criminal offense.[6] Indeed there is no dispute that it was committed in his presence. It is immaterial—if it be the case—that the ensuing arrest on probable cause violated Virginia law. Because no federal constitutional right was violated by the arrest, Fisher's § 1983 arrest claim against WMATA and Mickelson was properly denied by directed verdict. Cf. Patzig v. O'Neil, 577 F.2d 841, 848–49 (3d Cir. 1978) (error to direct verdict in § 1983 case where probable cause in factual dispute).

### B

The constitutional standard by which Mickelson's post-arrest custodial detention of Fisher is to be gauged is not so clearly defined. Whether there are any direct constitutional limits on the permissible duration of post-arrest, pre-hearing detentions of arrested persons by state officers is a question that has not been much before the federal courts.[7] No generally accepted view has emerged in the relatively few lower federal court decisions of which we are aware. The question is one of first impression with us.

In a line of § 1983 cases the former Fifth Circuit has apparently accepted the view that there are no such constitutional limits, notwithstanding the existence of limits imposed by state law, binding upon the state officers involved, in the form of requirements that arresting officers take an arrested person "immediately" or "without unnecessary delay" before a committing magistrate. See Perry v. Jones, 506 F.2d 778, 780–81 (5th Cir. 1975) (Texas law: "without unnecessary delay"); Anderson v. Nosser, 438 F.2d 183, 196 (5th Cir. 1971), modified en banc, 456 F.2d 835 (1972), cert. denied, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (Mississippi law: "without unnecessary delay"); see also Rheaume v. Texas Dept. of Public Safety, 666 F.2d 925, 929–30 (5th Cir. 1982) (Texas law: "immediately"). But other lower federal courts have simply assumed, though finding no violation on the facts at hand, that independently of any state law requirements there are ultimate durational limits derived from due process guarantees. See Patzig v. O'Neil, 577 F.2d at 846–47; Daly v. Pedersen, 278 F.Supp. 88, 94–95 (D.Minn.1967).

The Supreme Court has not addressed the issue directly.[8] But we think that in Ger-

6. Fisher suggests that because under state law the offense for which she was arrested is punishable only by fine and not by imprisonment of any duration, any custodial arrest and detention was per se unconstitutional. While there have been intimations from some members of the Supreme Court that perhaps for some minor offenses no custodial arrest should be considered constitutionally permissible, see Gustafson v. Florida, 414 U.S. 260, 266, 94 S.Ct. 488, 492, 38 L.Ed.2d 456 (1973) (Stewart, J., concurring) the Court has never so held. Robbins v. California, 453 U.S. 420, 450 & n.11, 101 S.Ct. 2841, 2858 & n.11, 69 L.Ed.2d 744 (1980) (Stevens, J., dissenting). Until such an interpretation of the reasonableness requirement of the fourth amendment is adopted by the Court, we must assume that it applies alike to all criminal offenses—without regard to severity or permitted punishment—to allow reasonable custodial arrests as the traditional means for invoking the criminal process.

7. The opportunities for raising the issue in federal courts have been structurally limited, at least until the revivification of 42 U.S.C. § 1983. Pre-hearing police detention is one of

those practices shielded from judicial scrutiny in direct and collateral attacks on convictions, see Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), unless an exclusionary rule can be invoked to test it. Aside from the fact that the exclusionary rule could of course only be invoked in the limited situation where evidence has been produced during the detention, it has not in any event been applied to state action cases through extension on constitutional grounds of the federal McNabb-Mallory rule. See generally Y. Kamisar, W. LaFave & J. Israel, Modern Criminal Procedure 514, 598 (4th ed. 1974).

This has meant that only in § 1983 cases such as the instant one, and presumably by an appropriate proceeding directly challenging one's post-arrest, pre-hearing custody on durational grounds, see Gerstein v. Pugh, 420 U.S. at 119, 95 S.Ct. at 865, has there been effective opportunity to test the existence and scope of such a right.

8. The Court's McNabb-Mallory exclusionary rule enforcing a durational limit on post-arrest detentions has been rested solely upon the re-

*stein* the Court has unmistakably now indicated that the fourth amendment does directly impose ultimate limits on the permissible duration of post-arrest, pre-hearing detentions. Though in *Gerstein* that was not the matter directly at issue,[9] the Court had of necessity to touch upon it in the course of analyzing the intended relationship under the fourth amendment between a judicial probable cause hearing and the earlier probable cause determination by a police officer incident to making a warrantless arrest. In critical part Justice Powell for the Court opined that

> [A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest. Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate. There no longer is any danger that the suspect will escape or commit further crimes while the police submit their evidence to a magistrate. And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly. The consequences of prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships. *See* R. Goldfarb, *Ransom* 32–91 (1965); L. Katz, *Justice Is the Crime* 51–62 (1972). Even pretrial release may be accompanied by burdensome conditions that effect a significant re-

straint of liberty. *See, e.g.,* 18 U.S.C. §§ 3146(a)(2), (5). When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty. Accordingly, we hold that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest.

420 U.S. at 113–14, 95 S.Ct. at 862–863.

From this we must conclude that the Court considers that the reasonableness requirement of the fourth amendment does carry over past arrest to place limits of permissible duration upon this particular period[10] of detention. The standard of reasonableness can only be that implied in the Court's observation that it is to be "brief" and, more specifically, that it is to be only that required "to take the administrative steps incident to arrest." *Id.*

Because the administrative steps incident to a particular arrest will necessarily vary with geographical factors and with local police and court system practices as well as with innumerable factual exigencies (including, of course, obstruction), this principle can only be applied on a case-by-case basis. *See Patzig v. O'Neil,* 577 F.2d at 846–47; *Daly v. Pedersen,* 278 F.Supp. at 94–95.

■ For this reason, a state law requirement expressed in unqualified terms that an arrested person is to be taken "immediately" before a committing magistrate may impose a more stringent standard than the

---

quirements of Fed.R.Crim.P. 5(a). The Court's failure, so far, to extend it to state action cannot, of course, be accorded any significance in determining whether it is also constitutionally grounded. *See* Y. Kamisar, W. LaFave & J. Israel, *Modern Criminal Procedure* 513–15 (4th ed. 1974).

**9.** The specific issue was "whether a person arrested and held for trial under a prosecutor's information is constitutionally entitled to a judicial determination of probable cause for pretrial restraint of liberty." *Gerstein,* 420 U.S. at 105, 95 S.Ct. at 858.

**10.** As we understand the *Gerstein* analysis, the period of initial post-arrest detention justified by the arresting officer's valid probable cause determination runs to a *timely* determination of probable cause by a judicial officer—with timeliness of the latter determination a matter of constitutional right under the fourth amendment. At that point, the legitimacy, the conditions, and the duration of any further, "extended," *see Gerstein,* 420 U.S. at 114, 95 S.Ct. at 863, pretrial restraints on liberty come under the direct protection of the due process clause. *See Bell v. Wolfish,* 441 U.S. 520, 533–34, 99 S.Ct. 1861, 1870–1871, 60 L.Ed.2d 447 (1978).

constitutional one under the circumstances of the specific case. As with the original custodial arrest, such a requirement of state law cannot therefore be held to affect the general constitutional standard. *Cf. Street v. Surdyka,* 492 F.2d 368 (4th Cir. 1974).

Applying the general standard here, we hold that no constitutional right of Fisher's was violated by Mickelson's conduct in detaining her in his custody from the time of her arrest until he relinquished her custody to other law enforcement officers at the Arlington County detention facility. As indicated, the state law requirement upon which Fisher alternatively relies—that a misdemeanant lawfully put under custodial arrest "shall be taken immediately before the nearest or most accessible judicial officer"—enlarges no fourth amendment rights respecting her post-arrest detention by Mickelson. As applied to that officer's conduct in this § 1983 claim, the constitutional standard required only that he not detain Fisher beyond the "brief period of detention to take the administrative steps incident to arrest." Fisher's evidence, taken in its most favorable light, fails to support a finding that he did.

Instead the evidence indisputably showed that following the arrest Mickelson promptly arranged for Fisher's transportation to the Arlington County Police Station; that he followed and at the station made appropriate inquiry of the officer on desk duty as to the booking procedure; that he followed the advice given, procured an arrest warrant, served it on Fisher, removed her handcuffs, read her *Miranda* rights to her, presented her to the booking desk where he relinquished custody to authorized officers of the facility, and soon departed to go about his duties. So far as the evidence discloses, all of this was done as expeditiously as the exigencies of geography, local police and magistrate procedures, and the plaintiff's conduct reasonably permitted. Whatever the constitutionally permissible duration of Fisher's post-arrest, pre-probable cause hearing detention may have been, Mickelson's conduct could not, as a matter of law, be held to have violated her rights by impermissibly prolonging it.[11]

The district court therefore did not err in directing verdict in favor of Mickelson and WMATA on this federal claim.

### III

The exact theory of Fisher's § 1983 claim against Sheriff Clements for deprivation of constitutional rights during her 15-hour detention in the Arlington County facility has not been consistently maintained. Turning now to that claim, it is important at the outset to define its final form, as put forward in Fisher's reply brief on this appeal. Her ultimate claim is not—though apparently it once was—that the totality of the conditions of her confinement during this period, including the confinement itself and the removal of her clothing following her feigned suicide, constituted a deprivation of her constitutionally secured rights. She has conceded in her final legal position that the "broad discretion given jailers faced with apparently suicidal detainees precludes" any claim "that placing her in a cell and removing her clothes under appropriate conditions was a constitutional violation." This is a concession well made. *See McMahon v. Beard,* 583 F.2d 172 (5th Cir. 1978).

11. The right that we deduce from *Gerstein* not to be impermissibly detained between arrest and judicial hearing must of course relate to state action by any agents of the state responsible for detention in this interval—not the arresting officer alone. By the same token, in a § 1983 action the conduct of any individual officer—including the arresting officer—charged as a defendant with maintaining the detention during this interval must be assessed standing alone and without regard to the conduct of others who jointly or successively maintain the detention. In this connection it is necessary to recognize the right of any individual officer, when acting responsibly in accordance with reasonable practices, to transfer custody to others for whose ensuing conduct he cannot be held responsible. State laws that on their face seem to impose a specific duty on the arresting officer to see that the arrested person is taken "immediately" before a judicial officer may in this respect also be revealed to impose a more stringent individual duty than does the constitution and § 1983.

In essence, Fisher's ultimate claim, following this concession, is that the conditions under which she was confined in a state of nakedness were not "appropriate" within the scope of the concession. Specifically relying upon our decision in *Lee v. Downs*, 641 F.2d 1117 (4th Cir. 1981), for the standard of appropriateness, she contends that though her stripped confinement was not "*per se* . . . constitutionally improper," her "stripped confinement under conditions where she could be and was observed by male guards and even male inmates . . . violated her right to privacy and confined her under intolerable conditions in violation of her due process rights." It is this narrow claim, pressed now only against Sheriff Clements, *see* note 1 *infra,* that we consider.

The constitutional right invoked can only be the due process right of a pre-trial detainee not to be subjected by agents of the state to "punishment" under the guise of, or as an incident of, a generally authorized detention. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In *Lee v. Downs,* 641 F.2d 1117 (4th Cir. 1981), we recognized that even with respect to persons incarcerated by the state following conviction, there are minimally retained rights of personal privacy subject to constitutional protection. Specifically with respect to the right invoked here by Fisher as a pretrial detainee we held that the "involuntary exposure of [an inmate's genitals] in the presence of people of the other sex" may "[w]hen not reasonably necessary" constitute a violation of constitutionally protected right vindicable under § 1983. *Id.* at 1119. Though the exact source of this constitutional right in a convicted inmate was not identified in *Lee v. Downs,* there must be at least an equal right in pretrial detainees, whose protectible rights of privacy under the due process clause are necessarily more substantial in general than are those of convicted inmates. *See Bell v. Wolfish,* 441 U.S. at 535 & n.16, 99 S.Ct. at 1872 & n.16. We have, in fact, recognized the existence of pretrial detainees' privacy rights in connection with the administration of an across-the-board strip search policy in which the genitals of detainees were exposed only to members of the same sex. *See Logan v. Shealy,* 660 F.2d 1007 (4th Cir. 1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982).

We must therefore recognize that as a pretrial detainee Fisher had a general right, constitutionally protected, not to be subjected by state action to involuntary exposure in a state of nakedness to members of the opposite sex unless that exposure was reasonably necessary in maintaining her otherwise legal detention. There remain, however, the critical questions whether the evidence was sufficient to support a jury determination that she had been so exposed, and whether, in any event, Sheriff Clements could be held liable for any exposure that occurred.

We observe of the first question only that it is a close one that we need not resolve. The evidence that Fisher was actually exposed to the view of—not to say actually seen by—any male is at best sketchy and indirect. Unlike the case presented in *Lee v. Downs,* 641 F.2d 1117, there is no direct evidence that she was not only exposed to possible view but was actually seen while naked by males. The indirect evidence on this point, taken in its most favorable light, is speculative: that a male could have seen her through the television monitor; that some males must somehow have seen her because of comments overheard by Fisher that suggested it. Whether, beyond this, any exposure that did occur could properly be charged to intentional or negligent conduct of any state officials rather than to Fisher herself is again a close one on the evidence.

As indicated, we pass these questions, however, because we conclude that in any event Clements could not be held liable under § 1983 for any deprivation of rights that occurred in the respect charged. There is no evidence that Clements participated directly in any of the events of Fisher's detention. He cannot be held liable vicariously under § 1983 for any conduct of his subordinates. *Vinnedge v. Gibbs,* 550 F.2d 926 (4th Cir. 1977). Neither could he

be held liable on the basis of a failure adequately to supervise or control any conduct that directly caused the specific deprivation charged. *Rizzo v. Goode,* 423 U.S. 362, 370–71, 376–77, 96 S.Ct. 598, 603–604, 606–607, 46 L.Ed.2d 561 (1976). Only if the evidence showed that conduct directly causing the deprivation was done to effectuate an official policy or custom for which Clements was responsible could he be liable. *Hall v. Tawney,* 621 F.2d 607 (4th Cir. 1980); *Vinnedge v. Gibbs,* 550 F.2d 926. The evidence would not support such a finding.

This is obvious when attention is focussed on the specific deprivation charged. It is not, as above indicated, that Fisher was placed in a detention cell with her clothes removed following her feigned suicide attempt. This might well have been done in effectuation of a general policy respecting the treatment of such detainees for which Clements was responsible. Indeed, his own testimony probably established a willing acceptance of responsibility for such a policy. But the deprivation charged here was more narrowly the exposure to male viewing that was alleged then to have ensued. There is nothing in the evidence either directly or indirectly supporting any determination that such an exposure was also in keeping with established policy or developed custom chargeable to Clements. Instead, all the evidence on the point was to the contrary: that the policy was to protect a detainee such as Fisher whose clothing had been removed under these circumstances from indiscriminate viewing by any but female custodians. That this policy may have been violated on this occasion by unauthorized subordinate conduct—or by sheer accident beyond the control of any official—cannot be charged to Clements under developed § 1983 doctrine. *Cf. Logan v. Shealy,* 660 F.2d 1007 (strip search policy concededly that of sheriff).

For this reason, the district court did not err in directing a verdict in favor of the defendant Clements on this federal claim.

IV

At the outset of this opinion we stated an assumption that in addition to her federal claims under § 1983, Fisher had asserted pendent state tort law claims against Mickelson and WMATA. The jurisdictional statement in her complaint invokes the pendent jurisdiction on the basis of a general allegation that "the acts complained of are tortuous (sic) in nature." Though pendent claims were not then pleaded in separate counts in the complaint, their elements are implicit in the factual allegations asserting violation by Mickelson of specific provisions of state law. The evidence adduced on trial clearly went to such claims as well as to congruent § 1983 claims. There is no indication in the record that Fisher ever formally abandoned any pendent state claims asserted.

But the record is simply ambiguous on the matter of the disposition by the district court of any such pendent claims. In the final colloquy between court and counsel preceding the bench order directing verdict in favor of all defendants, intimations can be found that both parties and the court considered that that motion went only to the § 1983 claims against Mickelson and WMATA. Fisher's counsel argued in conclusion that Mickelson's conduct "constitutes a false imprisonment . . . and pursuant to the Civil Rights Act constituted a § 1983 violation." Tr. 335. In its oral bench order directing a verdict the district court "rule[d] as a matter of law [Fisher] had no rights that were constitutional rights that were violated," Tr. 375, and did not specifically mention pendent state tort claims either in that order or in its written order. Nevertheless the final judgment from which appeal is taken in form clearly disposes of all claims in favor of the defendants.

On this appeal, the briefs of the parties are equally ambiguous on the matter. Fisher makes no specific point that the basis for directed verdict on state pendent claims would necessarily differ from the basis for rejecting the § 1983 claims against Mickelson and WMATA. But in fairness, her brief cannot be read to aban-

don her rights under those claims. The defendants similarly do not separately address the propriety of granting directed verdict on any pendent state claims in the case.

In sum, we simply cannot determine on the record before us whether 1) the plaintiff in effect abandoned any separate pendent state claims somewhere along the way in district court; 2) the district court directed verdict against plaintiff on the merits of those claims as well as the § 1983 claims against Mickelson and WMATA; or 3) the district court in effect dismissed the pendent state claims in an exercise of discretion incident to granting directed verdicts against plaintiff on the § 1983 claims. Because without making assumptions that we are not prepared to make, we cannot effectively review the district court's judgment as it might apply to pendent state claims, we think it appropriate to remand for first instance, separate disposition, on the record as made, of any pendent state claims that the district court determines were properly in the case at the time it directed verdict against the plaintiff. The basis of the disposition is of obvious importance both to the plaintiff and to this court in conducting fair review of the district court's disposition if review is sought.

We express no opinion on the proper disposition. With respect to discretionary dismissal, *see generally Rheaume v. Texas Dept. of Public Safety,* 666 F.2d 925, 931–32 (5th Cir. 1982) (propriety of discretionary dismissal). With respect to the merits of any pendent state claim against WMATA, *see Martin v. Washington Metropolitan Area Transit Authority,* 667 F.2d 435 (4th Cir. 1981) (statutory immunity to certain tort claims).

### V

The judgment is affirmed to the extent it dismisses on the merits the § 1983 claims against defendants Mickelson, WMATA, and Clements. The action is remanded for first instance disposition of any pendent state court claims determined by the district court to have been properly before it

at the time the court directed verdict for all defendants.

AFFIRMED IN PART; REMANDED FOR FURTHER PROCEEDINGS IN PART.