**Juanita I. CROSBY, Plaintiff,**

v.

**Edward J. REYNOLDS, et al., Defendants.**

**Civ. No. 89–0291–B.**

United States District Court, D. Maine.

May 6, 1991.

Jerome B. Goldsmith, Bangor, Me., for plaintiff.

Timothy C. Woodcock, Bangor, Me., for defendants.

## MEMORANDUM OF DECISION AND ORDER

HORNBY, District Judge.

This civil rights action alleges that Penobscot County Jail officials violated a female federal pretrial detainee's constitutional rights by housing her with a male

transsexual for two periods in 1989. She seeks declaratory and injunctive relief and damages. The defendants, three officials of the Penobscot County Jail, have moved for summary judgment pursuant to Fed.R. Civ.P. 56. For the reasons discussed below, I *GRANT* their motion.

## STATEMENT OF FACTS

Since the plaintiff has not contested the defendants' statement of material facts in support of their motion for summary judgment, those facts are deemed admitted. *See* Local Rule 19(b)(2). I have nevertheless considered the affidavits and the plaintiff's deposition in the light most favorable to her and have resolved any discrepancies in her favor.

Cheyenne Lamson, a/k/a Cheyenne Deneuve a/k/a Roger Miles ("Lamson"), is a 6'1" preoperative male transsexual. According to the Jail's contract physician, Richard Sagall, M.D., Lamson receives hormone treatments and has developed tissue resembling female breasts as a result. Though Lamson's male genitalia remain anatomically intact, Lamson has virtually no capacity to function sexually as a male. In Dr. Sagall's opinion, Lamson was psychologically a female throughout 1989. Dr. Sagall examined Lamson for the Jail initially in 1984 and recommended then that Lamson be housed with neither the male nor the female inmate populations. Later, however, when Lamson requested placement within the female population, Dr. Sagall told Jail authorities that he approved of this housing situation from a medical standpoint. He did not want Lamson housed with the male inmates because of both the physical and psychological harm that Lamson would likely suffer. Both Captain Thomas McCrea and Lieutenant Cheryl Gallant were aware that Dr. Sagall approved of Lamson's integration into the female inmate population and that he believed this would be in Lamson's best psychological and physical interest. Moreover, Dr. Sagall would not have approved the integration of Lamson into the general female inmate population if he thought that Lamson would constitute a physical threat to any of the female inmates. Prison officials specifically instructed Lamson to respect the privacy of the female inmates.

The plaintiff, Juanita Crosby, was placed in the Penobscot County Jail as a federal pretrial detainee on March 1, 1989. On two occasions during that year, she was housed in the same cell block as Lamson. Between July 6 and July 10, 1989, the plaintiff and Lamson shared a three-room cell block (S–Block) comprised of two cells, each containing a bed and a sink/toilet combination, and a common room containing a television set and a shower stall. On two instances during their incarceration together, Lamson entered the plaintiff's cell while she was using the toilet. Both times Lamson left immediately upon learning of the plaintiff's position. The plaintiff prepared herself to shower once but, because Lamson was in the common room and did not leave, decided not to take a shower. From July 6, 1989 to July 10, 1989, the plaintiff did not make any oral or written complaints to any prison officials about being housed with Lamson. She was transferred out of S–Block at her request, but did not inform the jailers of her motive in requesting the move.

For protective reasons, on October 1, 1989, Jail authorities housed all female prisoners and Lamson together in U–Block because of a reported sexual incident involving a male guard and female prisoner. The plaintiff, Lamson and nine other female inmates were placed in U–Block. U–Block has no sink/toilet combinations in the individual cells. Instead, adjacent to the day room, there is a common bathroom area containing all toilets, sinks and shower facilities. On October 2, 1989, Lamson walked into the bathroom area while the plaintiff was using the toilet and left immediately upon being informed of the plaintiff's presence. On one other occasion, because Lamson was preparing to meet a visitor, Lamson entered the bathroom area to put on makeup while the plaintiff was using the toilet. The plaintiff told Lamson she was using the toilet, but Lamson did not leave. The plaintiff took from 30 seconds to a minute to complete her use of the toilet. The final specific instance the plain-

tiff complains of occurred when she was emerging from the shower. The other inmates of U–Block, waiting for lunch, were lined up at the main cell door next to the door into the bathroom area. The plaintiff made eye contact with Lamson through a window in the door as she stepped naked out of the shower. She then stepped behind a toilet stall partition and quickly dressed. The plaintiff has asserted that on a number of occasions, she dressed beneath her covers to avoid exposing herself to Lamson.

Following the incident on October 2, 1989, the plaintiff and several other female inmates complained orally to prison officials about being housed with Lamson. Complaints were made to Corporal Rose Mannette, Sergeant Linda Hannan and Commanding Officer Bart Langley. Additionally, the plaintiff and five or six other inmates filed two written grievances dated October 16, 1989. According to the plaintiff's affidavit, Sergeant Brochu came into the U–Block on October 14, 1989 in response to the inmates' complaints and told them "you will all live together and get along, like it or not. If you do not like it, you can be moved to segregation."[1]

Lamson was removed from U–Block on October 16, 1989.[2] Following Lamson's removal to K–Block, the plaintiff had no further contact with Lamson.[3]

## DISCUSSION

The plaintiff charges a deprivation of her constitutional right to both procedural due process and privacy under 42 U.S.C. § 1983. Lamson is no longer housed at Penobscot County Jail nor, except for purposes of her deposition in this case, is the plaintiff.[4] The claims for declaratory and injunctive relief are, therefore, *MOOT.* Only the damages claim remains.

### I. *Procedural Due Process*

■ The plaintiff claims that her right to procedural due process was violated when Sgt. Brochu threatened to place any inmates filing further grievances concerning Cheyenne Lamson in "segregation" or "in the hole." It is apparent from the facts that the threat was never fulfilled. The plaintiff apparently was not intimidated or "chilled" by Sgt. Brochu's remarks since she and several other female inmates filed two written grievances two days after Sgt. Brochu's visit on October 14, 1989. She was never put into segregation or punished in any way after filing the two October 16, 1989 grievances. Finally, Lamson was moved to K–Block two days after Sgt. Brochu's visit, thus removing the subject of the plaintiff's complaints. I find no procedural due process violations.

### II. *Constitutional Right To Privacy*

■ Both the United States Supreme Court and the First Circuit Court of Appeals have recognized the existence of a constitutional right to privacy. *Roe v. Wade,* 410 U.S. 113, 152–154, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 484–485, 85 S.Ct. 1678, 1681–82, 14 L.Ed.2d 510 (1965); *Daury v. Smith,* 842 F.2d 9, 13 (1st Cir. 1988). The origins of this right to privacy

1. There is some disagreement regarding the date on which Sergeant Brochu visited U–Block. For purposes of this motion, I will assume that he talked to the inmates on October 14, 1989, (as set out in the plaintiff's Deposition Affidavit) prior to the filing of the written grievances on the 16th and after oral complaints had been made to other prison officials.

2. According to computer printouts of the Jail blocks dated October 17 and October 18, 1989, Lamson was in U–Block as of 6:00 A.M. on the 17th and then in K–Block as of 6:00 A.M. on the 18th. *See* Exhibits J and K attached to the March 7, 1991 Affidavit II of Cheryl Gallant. I will assume, however, for purposes of this motion that Lamson was removed on the date stated by the plaintiff in her Deposition Affidavit, October 16, 1989.

3. The only other complaint with respect to Lamson was filed by two other women on September 5, 1989. Sergeant Meade interviewed the two women out of Lamson's presence and both indicated that their chief concern was that Lamson continually "bummed" cigarettes and coffee from them. As a result of this, Lamson was placed in a cell alone until October 1, 1989, when Lamson was placed in U–Block. This placement was not based upon any determination that Lamson seriously intruded on the other inmates' privacy.

4. Both have been sentenced and assigned to Federal Correctional Institutions.

have been attributed to the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the United States Constitution. *See Roe*, 410 U.S. at 152. But the constitutional rights of a lawfully incarcerated prisoner are circumscribed or limited, *see Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977); *Hudson v. Palmer*, 468 U.S. 517, 524, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393 (1984).

Nevertheless, "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). One Circuit has recognized that pretrial detainees have "a general right, constitutionally protected, not to be subjected by state action to involuntary exposure in a state of nakedness to members of the opposite sex unless that exposure was reasonably necessary in maintaining her otherwise legal detention." *Fisher v. Washington Metropolitan Area Transit Authority*, 690 F.2d 1133, 1142 (4th Cir.1982). Another Circuit, however, has declared that such a right must give way to the needs of equal opportunity in hiring prison guards. *Timm v. Gunter*, 917 F.2d 1093, 1100 (8th Cir.1990). I have found no decision setting forth the privacy rights of prisoners vis-a-vis other prisoners who are transsexual.

The United States Supreme Court has clearly enumerated the standards a plaintiff must meet in order to recover damages from a government official under 42 U.S.C. § 1983.

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.... On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (footnote omitted). The Court recently added:

> [T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Thus an official "is not expected to determine the manner in which the law's grey areas will be clarified and defined." *Borucki v. Ryan*, 827 F.2d 836, 838 (1st Cir. 1987).

■ The question before me, therefore, is whether housing a preoperative transsexual with females, based upon a medical physician's professional advice, violates a clearly established constitutional right. In other words, would a reasonable official understand that what he or she is doing in undertaking such measures violates that right.

Lamson had been on regular hormonal treatment prior to being imprisoned and had been scheduled for a sex change operation in Colorado, which was deferred because of imprisonment. As a result of the hormonal treatment, Lamson had developed female-appearing breasts and had virtually no male sexual capacity. Lamson had been living for sometime on the outside as a woman. Jail officials knew that they would be placing Lamson in severe jeopardy if they were to house Lamson with the male population. Segregation of Lamson was not an ideal solution. Expert medical opinion informed Jail officials that housing Lamson with the female population would best satisfy Lamson's unique psychological needs and that there was no risk to the female inmates.

Jail authorities, obviously, do not frequently address such a quandary; well thought out and articulated policies were, therefore, not available. The Jail officials here were confronted with a situation that had no perfect answer. Lamson did not want to be segregated; it was physically and psychologically unsafe to place Lamson with males; and, as it turned out, some female inmates such as the plaintiff object-

ed to Lamson being housed with them. The Jail's solution may not have been ideal. But given the medical advice the Jail officials received, the instructions they gave Lamson and their removal of Lamson when opposition became known, I conclude that reasonable officials in their shoes would not understand that what they were doing violated the constitutional rights of the plaintiff. Although it is clear that there is a constitutional right to privacy, I conclude that the contours of that right are not clear when it comes to the determination of where to house transsexuals.[5] Such a constitutional right was not "clearly established in its more particularized sense" under these circumstances.

I conclude, therefore, that the defendants are entitled to qualified immunity on the plaintiff's charge that her constitutional right to privacy was invaded.

Accordingly, the defendants' Motion for Summary Judgment pursuant to Fed.R. Civ.P. 56 is hereby GRANTED.

---

5. I am not here called upon to decide whether a right to privacy would be clearly invaded if males and females generally were housed together. Indeed, the Maine Standards for County Jails submitted in this case specifically preclude such housing.