**Robert Dale STRICKLER, Plaintiff–Appellant,**

v.

**Gary WATERS, Sheriff; Commonwealth of Virginia; City of Portsmouth; Department of Corrections, Defendants–Appellees.**

**No. 92–6147.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 5, 1993.

Decided March 26, 1993.

---

D. Mark Grimm, Student Counsel, Appellate Litigation Program, Georgetown University Law Center, argued (Steven H. Goldblatt, Eric George, Student Counsel, Appellate Litigation Program, Georgetown University Law Center, Washington DC, on brief), for plaintiff-appellant.

Conrad M. Shumadine, Willcox & Savage, P.C., Norfolk, VA, Stuart E. Katz, City Atty., City Attorney's Office, Portsmouth, VA, Mark R. Davis, Office of Atty. Gen., Richmond, VA, argued (John S. Wilson, Mark D. Stiles, Willcox & Savage, P.C., Norfolk, VA, Nancy B. Cherry, Asst. City Atty., City Attorney's Office, Portsmouth, VA, on brief), for defendants-appellees.

Before WILKINSON, LUTTIG, and WILLIAMS, Circuit Judges.

## OPINION

LUTTIG, Circuit Judge:

Robert Dale Strickler, a Virginia prisoner, brought suit under 42 U.S.C. § 1983, alleging primarily that the conditions of his confinement at the Portsmouth City Jail violated his Eighth Amendment right not to be subjected to cruel and unusual punishment and that he was denied adequate access to the courts during his confinement there. The district court granted the motions to dismiss of defendants Commonwealth of Virginia and City of Portsmouth and granted defendant Sheriff Water's motion for summary judgment. For the reasons that follow, we affirm.

## I.

On June 15, 1990, the Circuit Court for the City of Portsmouth sentenced Strickler to a prison term of four years and four months. Strickler was committed on that day to the Portsmouth City Jail pending an unrelated trial in the Virginia Beach Circuit Court, because the Virginia Department of Corrections refuses to accept prisoners with outstanding charges in local jurisdictions. On December 4, 1990, fewer than thirty days after the conclusion of the Virginia Beach Circuit Court trial, Strickler was transferred to a state correctional facility.

Strickler brought a number of claims alleging violations of his constitutional rights during his approximately six-month confinement at the Portsmouth City Jail. Chief among these is a claim that the conditions of his confinement there violated his Eighth Amendment right to be free from cruel and unusual punishment. According to Strickler, during most of his stay at Portsmouth, he was housed in a seven-cell block with a day room measuring six and one-half by thirty-eight feet. Because of overcrowding at the facility, some inmates were required either to double-bunk or to sleep on mattresses on the floor of the day room. Prisoners were expected also to exercise in the day room, despite the fact that

the mattresses were rolled up and put aside only during meals and the daily cleaning. Further, climatological conditions inside the jail were occasionally uncomfortable, as fans and heating, ventilation and air conditioning equipment were inefficient and very little if any air penetrated jail windows, the screens of which were covered with dirt, dust, and rust, and some of which were partially blocked by concrete barriers to prevent prisoner escapes.

Strickler also claims that he was denied access to the courts as a result of the jail's inadequate library and his restricted access to that library, which includes the Virginia Code, the United States Code, and a set of *Corpus Juris Secundum.* Although he could request that legal materials be brought to his cell from the Portsmouth Circuit Court library, Strickler's direct access to the jail's law library was at best intermittent—one hour per week and sometimes as infrequently as one hour every five weeks. Strickler received no assistance from persons trained in the law in either an earlier *habeas corpus* proceeding, or in this civil action until on appeal, although he was represented by counsel in his ongoing criminal proceedings.

We discuss the Eighth Amendment and inadequate access claims in turn and then consider three ancillary claims advanced by Strickler.[1]

## II.

■ In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both "(1) a serious deprivation of a basic human need; and (2) deliberate indiffer-

ence to prison conditions on the part of prison officials." *Williams v. Griffin,* 952 F.2d 820, 824 (4th Cir.1991) (citation omitted). The Supreme Court has explained that the first showing requires the court to determine whether the deprivation of the basic human need was *objectively* "sufficiently serious," and the second requires it to determine whether *subjectively* "the officials act[ed] with a sufficiently culpable state of mind." *Wilson v. Seiter,* —— U.S. ——, ——, 111 S.Ct. 2321, 2324, 115 L.Ed 2d 271 (1991); *see also Hudson v. McMillian,* —— U.S. ——, ——, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). Because we conclude that Strickler has not established the serious deprivation of a basic human need required to survive summary judgment on his claim of an Eighth Amendment violation, we need not consider whether Sheriff Waters acted with an intent sufficient to satisfy the Amendment's state-of-mind requirement.

■ While recognizing that "[n]o static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual," the Supreme Court has warned that " 'Eighth Amendment judgments should neither be nor appear to be merely the subjective views' of judges." *Rhodes v. Chapman,* 452 U.S.337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (quoting *Rummel v. Estelle,* 445 U.S. 263, 275, 100 S.Ct. 1133, 1140, 63 L.Ed.2d 382 (1980)). Instead, "such judgment[s] should be informed by objective factors to the maximum extent." *Id.* (internal quotations omitted) (brackets in original). In an effort to infuse objectivity into the determination of whether a "serious deprivation" of a basic human need has occurred[2] and, at

---

1. With respect to the first two issues, we confine our discussion to the potential liability of Sheriff Waters, because we conclude below that the district court properly dismissed both the City of Portsmouth and the Commonwealth of Virginia and did not abuse its discretion in refusing to add as a party defendant the Director of the Virginia Department of Corrections.

2. *Rhodes* appears to urge reliance upon objective standards in determining whether, in the first instance, there has been a deprivation of a basic human need. *See* 452 U.S. at 346–47, 101 S.Ct. at 2399; *see also Union County Jail Inmates*

*v. Di Buono,* 713 F.2d 984, 999 n. 22 (3d Cir. 1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984). There is no less reason, however, to eschew subjectiveness in assessing whether that deprivation was so serious as to violate the Eighth Amendment. Indeed, the Supreme Court subsequently seems expressly to have recognized as much. *See, e.g., Hudson,* —— U.S. at ——, 112 S.Ct. at 999 (courts considering conditions of confinement cases must inquire whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation" (quoting *Wilson,* —— U.S. at ——, 111 S.Ct. at 2326)).

the same time, to ensure faithfulness to the Eighth Amendment's ban only of "cruel and unusual" punishments, we held in *Lopez v. Robinson* that, for prison conditions to rise to the level of unconstitutional punishment, " 'there must be evidence of a *serious medical and emotional* deteriora-

> Strickler fails to recognize the difference between the two inquiries. He repeatedly asserts that he need only show the deprivation of a basic human need, not that the deprivation was "serious," as required by *Wilson. See, e.g.,* Appellant's Br. at 13 ("First, the conditions of confinement must produce the deprivation of an identifiable human need (objective prong)."); Reply Br. at 2 ("*Wilson* only requires that an inmate establish a deprivation of a basic human need and deliberate indifference."). For the reasons discussed below, however, we are confident that Strickler's failure to come forward with evidence of serious deprivation is attributable to the absence of such a deprivation, rather than to Strickler's misunderstanding of the relevant standard.

3. There would appear to be little, if any, question that this is the standard the Supreme Court has instructed us to apply in Eighth Amendment prison condition cases. *See Hudson,* 112 S.Ct. at 1000 ("[E]xtreme deprivations are required to make out a conditions-of-confinement claim.... Because routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society,' 'only those deprivations denying "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation.' " (quoting respectively *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399, and *Wilson,* —— U.S. at ——, 111 S.Ct. at 2324 (in turn quoting *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399)); *id.* at ——, 112 S.Ct. at 999 (Courts must ask "if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." (quoting *Wilson,* —— U.S. at ——, 111 S.Ct. at 2326)); *id.* at —— n. 3, 112 S.Ct. at 1007 n. 3 ("I do not believe that there is any substantive difference between the 'serious deprivation' requirement found in our precedents and [a] 'significant injury' requirement.") (THOMAS, J., dissenting); *Wilson,* —— U.S. at ——, 111 S.Ct. at 2324 (question under objective prong is whether deprivation was "sufficiently serious"); *Manarite v. City of Springfield,* 957 F.2d 953, 955 (1st Cir.) (observing that Supreme Court requires "serious physical harm" in section 1983 cases alleging Eighth Amendment violations), *cert. denied,* —— U.S. —— 113 S.Ct. 113, 121 L.Ed.2d 70 (1992); *McCord v. Maggio,* 927 F.2d 844, 849 & n. 1 (5th Cir.1991) ("a showing of significant injury is a prerequisite to recovery"); *cf. Hudson,* —— U.S. at ——, 112 S.Ct. at 999 (although not dispositive, "absence of serious injury" is relevant even in excessive force cases).

tion attributable to' the challenged condition." [3] 914 F.2d 486, 490 (4th Cir.1990) (emphasis added) (quoting *Shrader v. White,* 761 F.2d 975, 979 (4th Cir.1985)).[4]

▮] We reaffirm today the essential holding in *Lopez* [5] and our earlier holding

4. We reversed in *Lopez* the district court's failure to award summary judgment in the defendant prison officials' favor on two of the inmates' claims specifically because there was no "hard evidence" that the challenged conditions—inadequate ventilation and cold cells—had caused any "serious medical and emotional deterioration." 914 F.2d at 491–92. Giving meaning to the requirement that there be evidence of a "serious" medical deterioration, we rejected as insufficient even to raise a genuine issue of material fact an illustrative affidavit representing that one inmate had suffered "mental stress as a result of being confined in a cell that lack[ed] adequate ventilation." *Id.* at 491.

> We held in *Shrader* that in order to make out an Eighth Amendment claim based upon the fear of assault from fellow inmates, a prisoner must show more than "simple anxiety"; he must show that his reasonable fear of assault "result[s] in significant mental pain." 761 F.2d at 979; *see also Purvis v. Ponte,* 929 F.2d 822, 825 (1st Cir.1991) (quoting *Shrader* with approval).

5. It appears that the actual holding of *Lopez* that there must be a "serious *medical* and emotional deterioration" is something of an historical accident attributable to a misquotation of the standard from our earlier opinion in *Shrader.* In *Shrader,* we affirmed a magistrate's holding that included language to the effect that before pain resulting from a fear of assault can give rise to a claim under the Eighth Amendment, there must be evidence of a serious *mental*—not medical—and emotional deterioration. *See* 761 F.2d at 979 (quoting magistrate's holding). (In fact, we approved an entirely different aspect of the magistrate's holding, namely that there must be "significant mental pain." *See id.* at 979.)

> Presumably the court in *Lopez,* in reading the term "mental" as "medical," mistakenly understood *Shrader* as having applied a broad rule (medical deterioration) to a narrow set of facts (alleged mental pain), rather than a narrow rule to a narrow set of facts. In any event, it is clear from the fact that it applied the "serious deprivation" standard from the *Shrader* requirement to claims of physical deprivation, *see, e.g.,* 914 F.2d at 490–92 (allegations of "physical harm"), that the *Lopez* court concluded that this basic principle of *Shrader* should apply with equal force in that context.

> Moreover, on the belief that had it not mistakenly read *Shrader* to require evidence of serious *medical* and emotional injury, the *Lopez* court would have inquired with respect to the claims

in *Shrader* that in order to withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions. The Eighth Amendment does not prohibit cruel and unusual prison conditions; it prohibits cruel and unusual punishments. If a prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition, he simply has not been subjected to cruel and unusual punishment within the meaning of the Amendment. *See supra* note 3.[6]

In his efforts to establish a constitutional violation, Strickler alleges deprivations caused by double bunking, limited exercise opportunities,[7] and inadequate ventilation.[8] Though such conditions could rise to the level of constitutional violations were they to produce serious deprivations of identifiable human needs, Strickler has come forward with no evidence that he has sustained any serious or significant physical or emotional injury as a result of these conditions.[9]

This is not the kind of extraordinary case of a palpable deprivation of the mini-

---

of physical harm before it, whether there was evidence of serious *physical* injury, we hold that a serious "physical" injury, rather than a serious "medical" injury, must be shown, where the plaintiff contends that prison conditions have caused him physical punishment.

6. The federal courts, including the Supreme Court, have used the terms "injury," "harm," and "pain" interchangeably in the Eighth Amendment context, although an injury or harm can be inflicted without pain—for example, through an overexposure to radiation—and arguably pain can be inflicted without injury—for example, through forced exposure to high-pitched sound waves or even through mandatory calisthenics. *See, e.g., Hudson,* — U.S. at ——, 112 S.Ct. at 999 ("The absence of serious injury is therefore relevant to the Eighth Amendment inquiry...."); *id.* (In excessive force cases, the "core judicial inquiry" is whether it was applied "to cause harm." (following *Whitley v. Albers,* 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986))); *id.* (the court must consider whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation" (quoting *Wilson,* — U.S. at ——, 111 S.Ct. at 2326)); *Wilson,* — U.S. at ——, 111 S.Ct. at 2325 ("If the pain inflicted is not formally meted out *as punishment*...."); *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399 ("Conditions must not involve the wanton and unnecessary infliction of pain....").

At first blush, the standard that we embrace today might be thought to exclude instances where pain was suffered but no enduring injury resulted. We are satisfied, however, that in the unusual circumstance where such pain is sufficiently serious to rise to the level of a constitutional violation, it will either itself constitute a serious physical injury or will result in an emotional injury that would be cognizable under our standard, *see Hudson,* — U.S. at ——, 112 S.Ct. at 1004 (BLACKMUN, J., concurring) (" 'Pain' in its ordinary meaning surely includes a notion of psychological harm."); *see also id.* at ——, 112 S.Ct. at 1009 (THOMAS, J., dissenting) (" 'Many things ... may cause agony as they

occur yet leave no enduring injury.' " (quoting *Williams v. Boles,* 841 F.2d 181, 183 (7th Cir. 1988))).

7. We, like the district court, *see* J.A. at 133, consider whether Strickler was denied exercise. Notably, however, as the district court emphasized, Strickler does not even specifically allege that he was deprived of such a right. *See id.* at 13 ("Inmates here are denied adequate *recreation* ... because of the overcrowded conditions." (emphasis added)).

8. The district court declined to address Strickler's allegations of inadequate ventilation, maintaining that he first raised this claim in a supplemental affidavit filed after amendment of his complaint. *See* J.A. at 126 n. 2. The district court treated this supplemental affidavit as a second motion to amend the complaint and denied it because of the advanced state of the proceedings and lapse of time since the filing of the original complaint.

Strickler maintains that he raised these claims in his original complaint, which recited that "there is no climate control and ventilation is poor this [sic] combined with the outside temp [sic] and humidity and body heat makes for a very explosive situation and is cruel and unusual." *Id.* at 14. We assume without deciding that Strickler properly raised this claim but, as discussed below, we hold that it does not suffice to establish a constitutionally cognizable injury, either standing alone or in concert with the other alleged deprivations.

9. Apparently aware that *Lopez* requires proof of serious injury, Strickler alleges that "his personal damages are phisical [sic] and mental deteriation [sic] and debilitation and a prolonged illegal detention which furthers his mental anguish." J.A. at 21. The mere incantation of "physical and mental injury," of course, is inadequate to survive a motion for summary judgment. At a minimum, an inmate must specifically describe not only the injury but also its relation to the allegedly unconstitutional condition.

mal requirements of civilized existence in which an inference of serious injury might be reasonable. Indeed, it is difficult to believe that Strickler has been injured at all as a result of any of the conditions that he challenges. We have previously held, for example, that there was no unconstitutional deprivation of the need for exercise where there was access to a day room eighteen hours each day, *Clay v. Miller*, 626 F.2d 345, 347 (4th Cir.1980), or where exercise was allowed only for two one-hour periods per week, *Sweet v. South Carolina Dep't of Corrections*, 529 F.2d 854, 866 (4th Cir.1975). The conditions described by Strickler are not qualitatively different from those in *Clay* and *Sweet*, especially given that it is undisputed that the inmates, had they so chosen, could have left the mattresses stacked in the day room throughout the waking hours and had ample room and opportunity for exercise.

 Similarly, accepting Strickler's allegation that the cell temperatures at Portsmouth were at times less than ideal, the inmates received blankets when the jail became uncomfortably cold, and the jail was equipped with fans when the temperatures were hot. (We note that such actions belie the type of "unnecessary and wanton" infliction of pain proscribed by *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399; *see also Wilson*, — U.S. at —, 111 S.Ct. at 2327 ("[A] low cell temperature at night *combined with a failure to issue blankets*" may establish an Eighth Amendment violation. (emphasis added))). At all times, furthermore, there was some degree of ventilation and fresh air. *See* Appellant's Br. at 18–19.

 Finally, it is well established that "double or triple celling of inmates is not *per se* unconstitutional." *Griffin*, 952 F.2d at 824; *see also Rhodes*, 452 U.S. at 348, 101 S.Ct. at 2400 ("[T]here is no evidence that *double celling* under these circumstances either inflicts unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment."); *Griffin*, 952 F.2d at 824–25 ("[O]vercrowding accompanied by unsanitary and dangerous conditions can consti-

tute an Eighth Amendment violation, provided an identifiable human need is being deprived."). Alone, double bunking simply does not constitute a cognizable Eighth Amendment deprivation.

Moreover, the several conditions of confinement challenged by Strickler rather clearly did not have "a mutually enforcing effect that produce[d] the deprivation of a single, identifiable human need." *Wilson*, — U.S. at —, 111 S.Ct. at 2327. In essence, Strickler alleges constitutional deprivation as a result of two conditions— overcrowding and excessive temperatures. Strickler alleges generally, however, only that these conditions resulted in an "explosive situation," *see* J.A. at 14, not that they deprived him of any "single, identifiable human need." *See Wilson*, — U.S. at —, 111 S.Ct. at 2327 ("Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists.").

When considering claims such as those by Strickler that conditions of confinement constitute cruel and unusual punishment, "courts must bear in mind that their inquiries 'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.'" *Rhodes*, 452 U.S. at 351, 101 S.Ct. at 2401 (quoting *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979)). Measured against constitutional standards, it is evident that Strickler failed to meet his heavy burden under the Eighth Amendment. Accordingly, we agree with the district court that summary judgment was warranted on his claim that the challenged conditions at Portsmouth Jail alone or in combination violated his Eighth Amendment right to be free from cruel and unusual punishment.

### III.

 Strickler next claims that he was denied his right of access to the courts both because the law library at Portsmouth City Jail is inadequate and because he was allowed inadequate access to the library.

"[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). For two independent reasons, Strickler's claim of inadequate access to the courts also fails.

## A.

■■■■ First, like the plaintiff in *Magee v. Waters*, 810 F.2d 451, 452–53 (4th Cir. 1987), Strickler, who was only temporarily confined at Portsmouth, has alleged "no specific problem he wished to research and ... no actual injury or specific harm which has resulted to him by his limited access to the jail library or its limited contents." [10]

Strickler contends generally that with better facilities he would have filed a *habeas corpus* petition earlier and thus "would be able to be nearing freedom of a high chance of Potenetially [sic] free at this

time." J.A. at 83. Such a vague and conclusory allegation does not state the kind of specific injury or prejudice to his litigation sufficient to survive summary judgment,[11] if it could be said to state an injury at all. *Cf. Chandler*, 926 F.2d at 1063 ("Indeed, the delay of little more than two weeks in initiating a proceeding that he delayed pursuing for a further year and that ultimately would take two-and-a-half years to reach final judgment in the district court is inconsequential."). Strickler claims for the first time in his reply brief before this court that his failure to properly name in his complaint the Director of the Virginia Department of Corrections *"may have been avoidable* if a library was available," Reply Br. at 8 (emphasis added). This *post hoc* claim, which is not only conclusory, but speculative, is likewise insufficient to show the actual injury required to survive summary judgment.[12]

■■■ Strickler attempts to distinguish *Magee*, and thereby to avoid its requirement of a showing of harm, on the ground

---

**10.** Most federal courts of appeals have imposed an "injury" requirement on prisoners raising access to courts claims. *See, e.g., Shango v. Jurich*, 965 F.2d 289, 292 (7th Cir.1992) ("some quantum of detriment caused by the challenged conduct of state officials *resulting in the interruption and/or delay of plaintiff's pending or contemplated litigation"); Crawford–El v. Britton*, 951 F.2d 1314, 1322 (D.C.Cir.1991) (deprivation must be linked to an "adverse litigation effect"), *cert. denied,* — U.S. —, 113 S.Ct. 62, 121 L.Ed.2d 29 (1992); *Sowell v. Vose*, 941 F.2d 32, 35 (1st Cir.1991) ("actual, meaningful impediment to [plaintiff's] participation in the [legal] process"); *Chandler v. Baird*, 926 F.2d 1057, 1062 (11th Cir.1991) (no denial where plaintiff demonstrated "no relation between the alleged refusals of materials, depositions, telephone calls, mail, and even pen and paper for a proposed 'letter to the courts' and any legal proceeding which could have been affected by the refusals"); *Sands v. Lewis*, 886 F.2d 1166, 1171 (9th Cir.1989) ("specific instance in which [plaintiff] was actually denied access to the courts"); *Crowder v. Sinyard*, 884 F.2d 804, 812 n. 8 (5th Cir.1989) (reading *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir.1983), as requiring a showing of prejudice), *cert. denied,* 496 U.S. 924, 110 S.Ct. 2617, 110 L.Ed.2d 638 (1990); *Walker v. Mintzes*, 771 F.2d 920, 932 (6th Cir.1985) (actual impediment in access to courts); *Holloway v. Dobbs*, 715 F.2d 390, 392 (8th Cir.1983) ("interference with or infringement of the prisoner's

constitutional right of access to the courts" (internal quotations omitted)); *Hudson v. Robinson*, 678 F.2d 462, 466 (3d Cir.1982) ("instance in which an inmate was actually denied access to the courts" (internal quotations omitted)); *Twyman v. Crisp*, 584 F.2d 352, 357 (10th Cir. 1978) (no allegation "that any of [plaintiff's] multitudinous filings have been stricken as untimely or that any of his cases have been dismissed or otherwise prejudiced").

**11.** The generalized nature of this allegation is underscored by the similar character of passages from Strickler's complaint in which he alleges injury. *See* J.A. at 13 ("Inmates here are denied ... adequate access to the law library because of the overcrowded conditions."); *id.* at 17 (Plaintiff "has learned since he has been at a state prison and had access to more adequate legal research material that the violation of his rights has been much more severe than he first thought...."); *id.* at 19 (Plaintiff "is certain he would not be in prison for this charge now had he had access to adequate legal research while he was incarcerated in Portsmouth jail.").

**12.** That Strickler was not prejudiced by any claimed lack of access resulting in his failure to name as a defendant the Director is further apparent from the fact that his equal protection claim itself plainly lacked merit. *See infra* Part IV.B.

that he was confined at Portsmouth for approximately six months, whereas Magee was confined for only twenty-nine days. Even assuming this difference in the length of temporary confinement in a local jail is of significance on the threshold question of whether an inmate has a constitutional access-to-courts claim, *see infra* Part III.B, we decline to hold that this difference relieves Strickler of the basic requirement that he show specific harm or prejudice from the allegedly denied access.

Strickler alternatively contends, on the asserted authority of *Chandler*, 926 F.2d at 1062–63, and *Sowell*, 941 F.2d at 34–35, that he should not be required to show actual prejudice to his litigation and that prejudice must be assumed from the facts he alleges. We do not read either case as providing authority for Strickler's claim. The observation in *Chandler* that an independent showing of injury should not be required where "prejudice inheres in the specific facts," *Chandler*, 926 F.2d at 1063, is *obiter dicta;* the Eleventh Circuit specifically held in that case that the inmate had alleged only "minor and short-lived impediments to access" and thus was required "to articulate facts indicating some prejudice such as being unable to do timely research on a legal problem or being procedurally or substantively disadvantaged in the prosecu-

tion of a cause of action." *Id.* The First Circuit in *Sowell* did not even embrace the *Chandler dicta* that prejudice necessarily inheres in some facts. Indeed, as if to discourage reliance upon the *Chandler* observation in its circuit, it suggested (also in *dicta*) only that "[a]n *absolute* denial of access to *all* legal materials, like an absolute denial of access to a law library or other basic form of legal assistance, might be deemed inherently prejudicial." 941 F.2d at 35. The court refused to infer prejudice to the prisoner before it because he had not alleged "such an unqualified deprivation." *Id.*

Strickler's contention that he need show no injury merely because he has alleged denial of the "core" *Bounds* requirements of an adequate library and access thereto arguably does find support in *Sands v. Lewis*, 886 F.2d 1166, 1171 (9th Cir.1989). There, in purported reliance upon *Peterkin v. Jeffes*, 855 F.2d 1021, 1041 (3d Cir. 1988),[13] the Ninth Circuit arguably held that there is no "actual injury" requirement where a prisoner alleges violation of one of the "core" requirements of *Bounds*, such as access to an adequate law library or legal assistance.[14] *Sands*, however, has not been followed by any other circuit[15]— indeed, it has not consistently been followed even in the Ninth Circuit, *see, e.g.,*

---

**13.** In *Peterkin*, the Third Circuit held that where a prisoner brings "an access to the courts claim that alleges the inadequacy of 'law libraries or alternative sources of legal knowledge' the analysis of whether an actual constitutional injury exists is simply the *Bounds* analysis." 855 F.2d at 1041 (citations and footnote omitted). The holding in *Peterkin*, however, was expressly limited to the "unique group" of "death-sentenced" prisoners. *See id.* at 1033. Apparently in recognition of the fact-specific character of *Peterkin*, Strickler does not cite that case in support of his access claim.

Even were *Peterkin* not limited by its own terms, Strickler alleges facts that are sufficiently dissimilar from those in *Peterkin* that it would be of little assistance to him. The death-sentenced prisoners in *Peterkin* were completely barred from using the available law libraries. They could request " 'specific cases, reporters by volume, or materials on a general subject matter, such as habeas corpus,' " *id.* at 1034 (quoting district court finding), but were prohibited from consulting with paralegals or jailhouse lawyers about which materials to request. *Id.;*

*see also Corgain v. Miller*, 708 F.2d 1241, 1248 (7th Cir.1983) (suggesting that such an exact-cite system, without more, might be inadequate).

**14.** Notwithstanding *Sands'* explicit embracement of the rule that no actual injury need be shown where "one of the core requirements under *Bounds* is involved," 886 F.2d at 1171, that case itself is probably best understood as *dicta*. Sands alleged that he had been denied neither an adequate law library nor adequate legal assistance. He challenged only the unavailability of carbon paper and the prison's refusal to allow him to maintain his memory typewriter in his cell. *Id.; see also Gluth v. Kangas*, 951 F.2d 1504 (9th Cir.1991) (*dicta*).

**15.** In *Ruark v. Solano*, 928 F.2d 947 (10th Cir. 1991), the Tenth Circuit cited *Sands*, but only in holding that no injury was required where the prisoner alleged that his access to the library was completely denied. *See also, e.g., McMaster v. Pung*, 984 F.2d 948, 953 (8th Cir.1993) (citing *Sands* as requiring injury where deprivation of core *Bounds* right not alleged).

*Johnson v. Moore,* 948 F.2d 517 (9th Cir. 1991) (rejecting library adequacy and access claims because prisoner "failed to demonstrate that these restrictions in any way handicapped his access to the courts")—and we decline to follow it in this circuit. *Bounds* did not hold that there is a right of access to a law library; it held that there is a right of access to the *courts.* It does not inexorably follow from the fact that an institution's library is inadequate or that access to that library is restricted, as *Sands* presupposes, that the prisoner was denied access to the courts. He may never have wished or attempted to access the courts, or he may have successfully gained access to them despite the library's inadequacy. In such circumstances, where the plaintiff has been accorded his right of access to the courts, we are simply without authority to adjudicate an abstract complaint about the library's adequacy or his access to the library. As Judge Easterbrook has written:

> A demonstration of inability to present a legal claim is an essential ingredient of a suit such as this because the prisoner must be able to show that the rules interfered with his entitlement (access to the courts) rather than with a mere instrument for vindicating an entitlement (access to books). When a prisoner who has had full access nonetheless contends that the law library services are not adequate, he is making a contention that only affects third parties, and thus inviting us to overstep the bounds of judicial authority. It is as if a prisoner who always has received adequate medical care files a suit contending that the prison's physi-

cians are not adequately trained, that the infirmary is poorly equipped, and so on. Such shortfalls might cause harm, but unless they have worked to the plaintiff's detriment he is not the right person to protest them.

*DeMallory v. Cullen,* 855 F.2d 442, 452 (7th Cir.1988) (dissenting).[16]

### B.

 Even if Strickler could make out a claim of actual injury, his claim would nevertheless fail because he has not shown that the law library at Portsmouth Jail, a local facility intended to house inmates for short periods only, is constitutionally inadequate, or that his access to that library was unconstitutionally restricted.

The Portsmouth Jail library includes sets of the Virginia Code, the United States Code, and *Corpus Juris Secundum.* Additionally, it is undisputed that "[f]urther research materials, including state and federal reporters[,] may be made available to inmates from the Portsmouth Circuit Court library upon request." J.A. at 61. Strickler maintains, however, that "[t]he absence of any case reporters in the Portsmouth Jail law library should, without more, compel reversal of the district court's grant of summary judgment." Appellant's Br. at 23. We disagree.

The Supreme Court has never directly addressed whether the right of access to the courts applies at all to inmates in local jails. Thus, it may be that a local jail designed to accommodate inmates for relatively short periods is under no obligation

---

**16.** In rejecting *Sands'* holding that any time a plaintiff alleges the existence of an inadequate library or inadequate access to a library, injury will be assumed, we need not hold that injury can never be assumed. Some courts, including our circuit, have suggested, for example, that injury may be presumed where a total denial of access to a law library or legal assistance is alleged, *see, e.g., Shango,* 965 F.2d at 293 (plaintiff alleged "at most an impingement, not a total abrogation, of meaningful access") (*But see DeMallory,* 855 F.2d at 449 (prejudice inheres in an allegation of "substantial and continuous" limitation on access to legal materials)); *Sowell,* 941 F.2d at 35 (*dicta*); *Harris v. Young,* 718 F.2d 620, 622 (4th Cir.1983) ("Because an inmate is

unable to discover his rights when library access or other access is denied him, any complaint rightly alleging a present denial of access to a library or other assistance states a valid claim for equitable relief."); *cf. Sowell,* 941 F.2d at 34 ("It may be true that a prisoner's 'legal property' ... is core material[ ], central to his right of access to the courts, but that fact alone does not make every regulation of access to such property inherently prejudicial, any more than the indisputably 'core' status of a prison law library makes every restriction on access to it an inherently injurious act.") (brackets in original; citation and internal quotations omitted). Strickler, however, has made no such allegation.

to provide access to the courts. *See Williams v. Leeke,* 584 F.2d 1336, 1344 n. 1 (4th Cir.1978) (Hall, J., concurring in part and dissenting in part) ("I would not impose *any* institutional duty upon jail facilities which are not primarily used for the long-term incarceration of persons who are otherwise without counsel."), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979); *see also Penland v. Warren County Jail,* 797 F.2d 332, 335 (6th Cir.1986) (With respect to the rights of visitation and access to the courts, "the measures that are achievable in larger institutions may not be reasonable in the smallest of local jails."); *Cruz v. Hauck,* 515 F.2d 322, 333 (5th Cir.1975) ("[I]n determining whether all inmates have adequate access to the courts, the district court need not consider those inmates whose confinement is of a very temporary nature or for purposes of transfer to other institutions"), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 322 (1976). We have held, however, that at least jail inmates serving substantial sentences in local facilities must be afforded access to the courts. *Williams v. Leeke,* 584 F.2d at 1340–41. But even assuming that Strickler was confined for a period of sufficient length that he had a vested right of access to the courts, we do not believe that he was deprived of that right.

A local facility need not provide the same resources, much less the same quality or extent of resources, as must a state facility, because the expectation is that its occupants will be confined there only briefly and that they will have access to more extensive resources upon arrival at a state correctional facility. *See Williams v. Leeke,* 584 F.2d at 1340 ("We should not be understood to say that every small jail must have a law library...."); *Morrow v. Harwell,* 768 F.2d 619, 624 (5th Cir.1985) ("Of course, the number of inmates at a

given facility who are there long enough to have *Bounds* rights is important to what the defendant must do to *remedy* the violation. With only a few nontransient inmates, for example, judicial access can be met with much less than otherwise.").[17] Whether or not it is true therefore that, to pass constitutional muster, a law library at a state prison must include at least some case reporters, we are satisfied that no such constitutional requirement exists with respect to local jails.

Through *Corpus Juris Secundum,* a prisoner can obtain a general overview of the law and of specific areas of law relevant to him as a prisoner, as well as knowledge of the elements of and facts necessary to plead particular causes of action. By studying the United States Code and Virginia Code, he can learn of the specific federal and state statutes and constitutional provisions on the authority of which he might be able to secure relief. And by canvassing the various annotations and comments in these volumes, he can glean the theories upon which relief has actually been granted or denied in the federal and state courts and identify by name and citation the authorities that might support his expected causes of action. These resources are more than adequate to permit an inmate to explore possible theories of relief, determine the facts that must be present to make out claims under any available theories, and to frame pleadings before the federal or state courts should he wish to do so. Certainly when coupled with the meaningful access to additional materials that was available upon request through the Portsmouth library call system, there can be no question that the resources available to Strickler were sufficient, *see Bounds,* 430 U.S. at 832, 97 S.Ct. at 1500 ("[A] legal access program need not include any particular element we have discussed, and we encourage local experimentation. Any plan, however, must be evaluated as a whole...."), especially giv-

---

17. For the occasional inmate who has been confined in the local jail for an unusually long period, a lesser quality resource may be unacceptable. *Cf. Harris,* 718 F.2d at 623 n. 3 ("[I]t may well be argued that no matter what you call an institution: jail, prison, farm or other enclosure that incarceration therein for such a long period of time [as two and one-half years] would put an official on notice that he was obliged to provide access to an adequate library or to counsel long before *Williams* [*v. Leeke*]."). Whatever that period, however, we are comfortable that it is more than the six months served by Strickler.

en the liberal pleading rules and the solicitude with which *pro se* pleadings are considered, *see, e.g., Eakins v. Reed*, 710 F.2d 184, 186 (4th Cir.1983); *Gordon v. Leeke*, 574 F.2d 1147, 1152–53 (4th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978); *see also infra* Part IV.B.[18]

 Finally, Strickler maintains that his access to the library was unconstitutionally "restricted to once a week at best for an hour and at times once in five weeks for an hour." J.A. at 18. In *Magee*, we left little doubt as to our view that access to a library of one hour a week for a temporary occupant of a city jail who, like Strickler was awaiting transfer to a state facility, satisfied constitutional requirements, *see* 810 F.2d at 452, and we have no reason to reconsider that judgment here. Moreover, we are unwilling to conclude that Strickler's inability on a few occasions to have access to the library more frequently than once in five weeks deprived him of his right of access to the courts. "[T]he adequacy of access cannot be measured by mere calculation, ... [T]he question to be decided is whether a particular plan insures meaningful access to the courts." *Williams v. Leeke*, 584 F.2d at 1340 n. 2. Here, during periods when he was unable directly to gain access to the library, Strickler was able to receive legal materials from the Portsmouth Circuit Court library upon request, which he could review in his cell or elsewhere at his own convenience and for as long as he wished. This continuous ability to obtain legal materials ensured that in the interim between library visits Strickler was afforded meaningful access to the courts.[19]

## IV.

Strickler makes three additional claims, all of which we reject.

### A.

 Strickler claims first that his involuntary exposure before female penal officers violated his constitutional rights. Though convicted prisoners necessarily forfeit many of their constitutional rights by virtue of their confinement, *see Wolfish*, 441 U.S. at 545, 99 S.Ct. at 1877, we have held that, when not reasonably necessary, exposure of a prisoner's genitals to members of the opposite sex violates his constitutional rights, *see Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir.1981). Because Sheriff Waters cannot be held vicariously liable for any conduct of his subordinates, *see, e.g., Fisher v. Washington Metro. Area Transit Auth.*, 690 F.2d 1133, 1142 (4th Cir. 1982), Strickler must show "that conduct directly causing the deprivation was done to effectuate an official policy or custom for which [the Sheriff] was responsible," *id.* at 1143. The evidence proffered by Strickler does not satisfy this requirement.

Strickler maintains that he was exposed to female officers in the "back office" area, where prisoners housed in the basement shower and where those entering and leaving the jail are strip searched, dress, and use the toilet. In addition, he claims that he was routinely exposed to female officers who patrolled the cellblock. It is conceded by defendants that female officers work in the back room and patrol the cellblock. However, it is undisputed that curtains conceal the male prisoners while they shower, J.A. at 137, and that the female guards

18. *Williams v. Leeke* is not to the contrary. In that case, the court intimated that completely denying an ordinary prisoner (as opposed to a high-security-risk inmate) access to a library, even where he is able to request legal materials from the prison library, might be unconstitutional. 584 F.2d at 1339. Here, of course, Strickler was provided access not only to a library, but to an adequate one, with the resources of which he could meaningfully request additional materials. Such a system far exceeds that that *Williams v. Leeke* suggested would be insufficient. *Id.* ("Simply providing a prisoner with books in his cell, if he requests them, gives the prisoner no meaningful chance to explore the legal remedies he might have."); *see also*

*Caldwell v. Miller*, 790 F.2d 589, 605–07 (7th Cir.1986) (no constitutional violation where there is direct access to research and reference materials in basic satellite library if coupled with ability to request specific caselaw from main library); *Campbell v. Miller*, 787 F.2d 217, 228–29 (7th Cir.), *cert. denied*, 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986); *Corgain*, 708 F.2d at 1248.

19. Because of this ability of continuous access, we view as immaterial the difference of some five months between Magee's and Strickler's terms of confinement, as this difference would bear upon Strickler's library access claims.

cannot observe the male prisoners from the waist down during strip searches because of a counter in the back room that obscures their view, *id.* (Strip searches are conducted by members of the same sex only.) Nor did Strickler contest below that prison officials make efforts to ensure that female officers walk the cellblock only at regular intervals so that their appearance may be to some extent anticipated. *Id.* at 136; *see also id.* at 15 ("[F]emale deputies walk thru [sic] the male cellblocks to deliver mail or escort medical personal [sic] or maintenance persons.").[20]

Strickler cannot on these facts make out a claim that his exposure was "done to effectuate an official policy or custom for which [the Sheriff] was responsible." It is clear not only that Strickler has not been unreasonably exposed to persons of the opposite sex, *Hudson v. Goodlander,* 494 F.Supp. 890, 891 (D.Md.1980) ("[N]either an inadvertent encounter nor a regularly scheduled visit by a female employee at an announced time ... rise[s] to the level of a constitutional deprivation."), but also that Portsmouth officials have taken measured precautions to prevent the unreasonable exposure of prisoners' genitals to members of the opposite sex.

### B.

Strickler next contends that the district court erred in dismissing his complaint against the State of Virginia. Strickler had claimed that the differing conditions at state and local jails violated his Fourteenth Amendment right to equal protection.[21] As neither the Commonwealth of Virginia nor its Department of Corrections is a proper party to a section 1983 suit, however, *see*

*Will v. Michigan Dep't of State* Police, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."), the district court granted the state's motion to dismiss.

 Strickler first argues that the district court abused its discretion in denying Strickler's motion to add the Director of the Virginia Department of Corrections as a defendant. Shortly after filing his original complaint, Strickler amended it by adding as a defendant the "State of Virginia and the Dept [sic] of Corrections in particular." J.A. at 18. Much later, about fifteen months after the original complaint was filed—after he had already once amended his complaint and six days before the district court filed its memorandum opinion—Strickler filed a "Motion to Show Special Injury," which the district court construed as a motion to amend the complaint to include the Director. In its memorandum opinion, the district court denied this motion because the "case ha[d] matured to the point that granting the motion would result in needless delay." *Id.* at 126 n. 2. We cannot conclude that under the circumstances the district court abused its discretion in denying Strickler's motion. In the interests of fairness to parties whose joinder is sought and the expeditious resolution of disputes, district courts must be given increasing latitude as the proceedings before them progress to deny motions seeking to add parties.

 Alternatively, Strickler argues that the district court erred in not directing the addition of the Director as a defendant. In *Gordon v. Leeke,* 574 F.2d at 1152–53, we held that:

> ment on whether an inmate's right to privacy is violated when he is observed using the unenclosed toilet by an officer of the opposite sex." *Id.* at 137–38.

**20.** Strickler alleged that female guards can see inmates using the toilet in the back room, which is infrequently used because there are toilets in the cells. The district court awarded summary judgment to the defendants on Strickler's challenge to this condition, however, on the ground that Strickler did not allege that he himself used or had been seen using this toilet, a ruling which was clearly correct, *see* J.A. at 10 ("We have been denied our right to privicy [sic] as *the male inmates* are expected to undress and dress, shower and use the bathroom in front of both male and female deputies." (emphasis added)). The district court expressly did not "pass judg-

**21.** Strickler asserts two bases for this claim, the gist of which are first that as a state prisoner in a local jail, he was denied benefits such as educational opportunities, contact visits, outside recreation, and the level of pay afforded to state prisoners, *see* J.A. at 2–3, 14, and second that state prisoners in state facilities receive more generous good time credit allowances, *id.* at 20, Appellant's Br. at 3.

A district court is not required to act as an advocate for a *pro se* litigant; but when such a litigant has alleged a cause of action which may be meritorious against a person or persons unknown, the district court should afford him a reasonable opportunity to determine the correct person or persons against whom the claim is asserted, advise him how to proceed and direct or permit amendments of the pleadings to bring that person or persons before the court.

We subsequently explained that included in the *Gordon v. Leeke* responsibility "to ensure that technical problems of pleading, and practice and joinder" do not prevent prosecution of *pro se* suits "is the duty, when it becomes apparent to the district court that a governmental official not named in the complaint is legally responsible for the challenged decision, to inform the pro se complainant of his right to join that official as a defendant...." *Eakins,* 710 F.2d at 186. We of course remain cautious not to "transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." *Beaudett v. Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985), *cert. denied,* 475 U.S. 1088, 106 S.Ct. 1475, 89 L.Ed.2d 729 (1986); *see also id.* at 1276 ("Though [*pro se*] litigants cannot, of course, be expected to frame legal issues with the clarity and precision ideally evident in the work of those trained in law, neither can district courts be required to conjure up and decide issues never fairly presented to them.").

Given that there were at least facially three independent defects in Strickler's claim that he had been denied equal protection, we cannot conclude that it should have been apparent to the district court that the Director was a proper party defendant, or that, even had it been apparent, the district court was under a duty to name the Director as a defendant. First, absent a right to have been housed in a state facility during the time he was confined at Portsmouth, a right that Strickler did not and almost surely could not allege (and one that the State of Virginia does not believe

he has, *see* Va.Code Ann. § 53.1–20), he was not similarly situated for equal protection purposes with state prisoners in state facilities, and therefore his claim necessarily would have failed.

Second, even had he been similarly situated, it is highly improbable at best that Strickler could have shown that the difference in treatment of state prisoners such as Strickler with pending local charges and those without such charges serving their sentences in state correctional facilities was not rationally related to a legitimate state purpose. *See, e.g., Moss v. Clark,* 886 F.2d 686, 689–90 (4th Cir.1989) (no equal protection violation where District of Columbia statute governing award of good time credits applied only to D.C. prisoners held in D.C. facilities) (citing *McGinnis v. Royster,* 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973), in which the Court rejected an equal protection challenge to New York's practice of awarding good time credits based on presentence incarceration in county jails); *Kersh v. Bounds,* 501 F.2d 585, 588 (4th Cir.1974) (no equal protection violation where, unlike state prisoners held in state facilities, prisoners convicted of state offenses but temporarily held in county facilities were denied unnecessary medical care), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1120, 43 L.Ed.2d 394 (1975); *Hill v. Hutto,* 537 F.Supp. 1185, 1189 (E.D.Va. 1982) (finding equal protection violation where state prisoners were held in local jail because of lack of space at state facilities but cautioning that "this holding does not limit in any way the [Virginia Department of Correction's] power to vary conditions of confinement on the basis of a rational classification system"). Indeed, "Strickler does not dispute the state's interest in retaining the option to keep prisoners in local facilities pending resolution of local charges," Reply Br. at 14, a concession of rational purpose for differential treatment that would appear fatal to Strickler's equal protection claim.

Finally, the Director, who was not amenable to suit in his official capacity, *see Will, supra,* almost surely would have effectively mounted a qualified immunity defense in his personal capacity. *See Harlow v. Fitzgerald,* 457 U.S. 800, 815–19, 102

**1390**

S.Ct. 2727, 2736–39, 73 L.Ed.2d 396 (1982). In light of authority such as *Moss* and *Kersh,* and Strickler's concession of a rational basis for housing him at Portsmouth, we cannot conclude that he alleged a violation of clearly established law of which a reasonable official would have known.

### C.

■ Finally, Strickler challenges the district court's dismissal of his complaint against the City of Portsmouth on the grounds that under Virginia law, the Sheriff has been granted independent authority to establish policies and procedures for the Sheriff's department. *See Himple v. Moore,* 673 F.Supp. 758, 759 (E.D.Va.1987) ("Under Virginia law, the Sheriff has been granted the authority to make policy for the Sheriff's Department, not for the County. Thus, while local governmental entities may be held liable under § 1983, the County is not the proper party here."); *Sherman v. City of Richmond,* 543 F.Supp. 447, 449 (E.D.Va.1982) ("Neither the City of Richmond nor the Commonwealth of Virginia is responsible for the actions of the Sheriff of the City of Richmond.... As a [state] constitutional officer, the Sheriff serves independent of the municipal or county government and independent of the State government."). Strickler concedes that it may be "generally true that a Sheriff under Virginia law is granted independent authority to establish policies and procedures for the Sheriff's Department." Appellant's Br. at 34. He argues nonetheless that Va.Code Ann. § 15.1–257 (imposing upon City of Portsmouth "costs [of a jail] and of the land on which [it] may be, and of keeping the same in good order"), exposes the city to municipal liability under *Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). We do not agree.

Under *Monell,* a municipality may be liable for the acts of its employees "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694, 98 S.Ct. at 2037; *see also Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89

L.Ed.2d 452 (1986) ("[W]hether an official had final policymaking authority is a question of state law."). The City of Portsmouth is not liable under section 1983 for the actions of its Sheriff in the administration of its jail, because under the law of Virginia those actions do not embody an official policy of the City of Portsmouth. That the city apparently is charged with keeping the jail "in good order" in no way alters this conclusion. The cited statute at most obligates the city to provide for the jail's physical plant, not to oversee the activities within. Accordingly, the district court properly dismissed Strickler's complaint against the City of Portsmouth.

### CONCLUSION

For the reasons stated, the judgment of the district court is affirmed.

*AFFIRMED.*