Donald Cornelius **JACKSON,** Plaintiff,

v.

Ms. **WILEY,** DMCC Nurse, Dr. **Moore,** DMCC Assistant Warden, Ms. D. **Graham,** DMCC Grievance Coordinator, Dr. Sonja **Johns,** DMCC Doctor, Mr. Page **True,** SISP Warden, Ms. K. **Fowlkes,** SISP Law Librarian, Mr. **Smith,** SISP Sergeant, Ms. T. **Tyler,** SISP Medical Administrator, Dr. **Wilson,** SISP Doctor, Mr. Rufus **Fleming,** Regional Director, Mr. David **Robin-**son, NCC Warden, Ms. J. **Terry,** NCC Law Librarian, Ms. N. **Matthews,** NCC Grievance Coordinator, Mr. L. **Thompson,** NCC Doctor, and Mr. W.P. **Rogers,** Regional Director, Defendants.

No. **ACTION 2:02CV652.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Feb. 10, 2004.

Donald Cornelius Jackson, Oakwood, VA, pro se.

Keith Brian Marcus, Bremner Janus Cook & Marcus, Mark R. Davis, Office of the Attorney General, Lynne Julia Fiscella, Edward Joseph McNelis, III, John David McChesney, Rawls & McNelis PC, Richmond, VA, Michael Eugene Ornoff, Michael E. Ornoff PC, Virginia Beach, VA, for Defendants.

## OPINION AND FINAL ORDER

FRIEDMAN, District Judge.

Plaintiff, a Virginia inmate, brings this *pro se* action pursuant to 42 U.S.C. § 1983, to redress alleged violations of his constitutional rights. Specifically, plaintiff claims that he was denied adequate medical care, access to prison law libraries, and religious materials, and was subjected to an abusive strip search and unconstitutional prison conditions. Plaintiff also contends that his incoming and outgoing mail was unreasonably restricted and that he was unreasonably fired from his job as a law clerk. Plaintiff seeks injunctive and monetary relief.

### I. Procedural History

By order filed October 9, 2002, plaintiff's motion to proceed *in forma pauperis* was granted. After plaintiff submitted the initial partial filing fee, his complaint was ordered filed on March 24, 2003.

On April 24, 2003, defendants Thompson and Johns filed a motion to dismiss. Defendant Wiley filed a motion to dismiss on September 8, 2003.

On September 8, 2003, defendants Tyler and Wilson filed a motion for summary judgment and a memorandum and affidavits in support thereof. Defendants Smith, Fowlkes, True, Graham, Fleming, Robinson, Terry, Matthews, Rogers and Moore also filed a motion for summary judgment and a memorandum and affidavits in support thereof on September 8, 2003.

In accordance with *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir.1975), plaintiff was given an opportunity to respond to defendants' motions with any material that he wished to offer in rebuttal. Plaintiff was instructed that failure to submit any materials could result in an adverse judgment based on defendants' motions and, if applicable, accompanying affidavits. Plaintiff has responded to defendants' motions to dismiss and motions for summary judgment; therefore, these matters are ready for judicial determination.

### II. Facts

#### A. Medical Care

On July 25, 2001, when plaintiff first arrived at Sussex I State Prison, Nurse Foster reviewed plaintiff's medical information. She notified defendant Dr. Charles Wilson ("Wilson"), then employed as the prison's Medical Director and an institutional physician, that plaintiff was taking 800mg of Motrin, two times per day, to treat his lower back pain. On this date, Wilson ordered plaintiff a seven (7)-day continuation of 800mg of Motrin. Aff. Tonya Tyler, L.P.N. ¶ 8.

On September 11, 2001, plaintiff complained of low back pain and reported that he believed he had high blood sugar. The treating nurse scheduled plaintiff to be seen by the institutional physician and provided plaintiff with a three (3)-day prescription for 400mg of Motrin. Aff. Tyler ¶ 9.[1] Plaintiff's appointment with Wilson

---

1. Standard protocol at Sussex I State Prison requires that an inmate requesting non-emergency medical care be seen initially by a prison nurse, before being scheduled for an

was delayed because the prison was on a modified lockdown, in the wake of the September 11, 2001, terrorist attacks. Aff. Wilson ¶ 9.[2]

On October 4, 2001, plaintiff was again seen by medical staff. The record shows that plaintiff was worried about his blood sugar level and desired a renewal of his Motrin prescription. Aff. Tyler ¶ 11; see also Aff. Wilson ¶ 10. On October 10, 2001, Wilson visited plaintiff at plaintiff's cell door and advised plaintiff that he could not arrange a full evaluation of plaintiff in the medical department, at that time, because the prison was on a modified lockdown. Aff. Wilson ¶ 11; see also Aff. Tyler ¶ 11. On the date of this visit, plaintiff did not appear to be in any acute distress or require immediate medical attention. Aff. Wilson ¶ 11.

On November 5, 2001, plaintiff was evaluated by another prison nurse. Plaintiff requested that his blood sugar level be tested and complained of low back pain. The evaluating nurse ordered Motrin for plaintiff and scheduled an appointment for plaintiff to be seen by Wilson. Plaintiff was evaluated by Wilson on November 7, 2001. Plaintiff's blood sugar was tested and determined to be somewhat elevated at 147. Wilson diagnosed plaintiff as having Type II diabetes and prescribed plaintiff 5 mg of Glucotrol four (4) times per day for 180 days. Wilson also ordered that plaintiff's blood sugar be checked two (2) times per day for 180 days, in order to monitor the medication's effectiveness. Aff. Wilson ¶ 13; see also Aff. Tyler ¶ 13.[3]

Plaintiff was seen by another medical nurse after complaining of back pain on November 27, 2001. Plaintiff was ordered a five (5)-day supply of Motrin 200 mg[4] two (2) times per day and advised to follow-up with the medical department if his condition changed.[5] Id. at 14.

On December 26, 2001, Wilson briefly examined plaintiff, due to plaintiff's recurring complaints of low back pain.[6] Wilson determined that plaintiff's back pain presented a chronic condition, because non-steroidal anti-inflammatory medication, i.e. Motrin, had not helped plaintiff. Aff. Tyler ¶ 15. Wilson believed plaintiff's ongoing back pain was likely caused by muscle spasms, which could effectively be treated by a muscle relaxant. Aff. Wilson at ¶ 15. Therefore, Wilson prescribed plaintiff 500 mg of Robaxin two (2) times per day for seven days and provided plaintiff with a list of back exercises that he could perform to improve the condition of his back and to alleviate back pain. Id. On January 10, 2002, Wilson re-ordered an additional seven (7) day prescription of Robaxin for plaintiff. Id. at ¶ 16.

examination by the institutional physician. Aff. Charles Wilson, M.D. ¶ 6; see also Aff. Tyler ¶ 7.

2. Defendant Tyler explains that neither she nor any other medical staff member has control over security issues at the prison, such as a security lockdown. Id. ¶ 22.

3. In his original complaint, plaintiff alleged that he was not placed on a restrictive diabetic diet; however, plaintiff's medical records indicate that he had been provided such.

4. Wilson did not continue plaintiff on the higher 400 mg dosage of Motrin because of the increased risk of gastric bleeding. Wilson founded his decision on medical statistics, which show one-fourth of all gastric ulcers are caused by the use of Motrin.

5. Wilson explains that standard nursing protocol allows an inmate to receive pain medication, such as Motrin, directly from nursing staff. Therefore, it is not necessary for an inmate to be seen directly by a the institutional physician for such. Aff. Wilson ¶ 14.

6. Wilson noted that he could not formally examine plaintiff on this date, because the prison was on lockdown.

On January 15, 2002, Wilson formally examined plaintiff and performed a complete neurological examination of plaintiff to assess plaintiff's back pain. Aff. Wilson ¶ 17. The findings of this exam were within normal limits; thus, Wilson determined that plaintiff had no significant back disease or neurological deficits. Because no neurological tests or objective findings supported plaintiff's ongoing back problem, Wilson determined that plaintiff neither required the Robaxin or an increased dosage of Motrin. *Id.*

Also on January 15, 2002, Wilson reviewed plaintiff's blood sugar levels. Wilson noted that plaintiff's diabetes was "well-controlled" and continued plaintiff on Glucotrol, to further maintain plaintiff's blood sugar levels. *Id.* ¶ 19.

Plaintiff was transferred to Nottoway Correctional Center on June 26, 2002. Aff. Wilson ¶ 22.

## B. Library Access

### 1. Nottoway Correctional Center

Plaintiff submitted informal requests to attend the Law Library on May 24, May 29, and June 7, 2001. Aff. L. Kelly ¶ 9. Plaintiff also submitted requests on May 16, June 12, June 18, and June 25, 2001. "Plaintiff's Response Opposing to Defendant's Motion to Dismiss" ("Pl.'s Resp. Br.") ¶ 19.[7] Plaintiff was informed that his name would be added to the library attendance list in the order that requests were received from inmates. Plaintiff was granted access to the law library from June 11, 2001 through June 16, 2001, and plaintiff attended the library each day. Aff. L. Kelly ¶ 9.[8]

Plaintiff submitted another request for library time on July 10, 2001. A response to plaintiff's request informed him that he could attend from July 23 through July 28, 2001; however, plaintiff was added to the library list from July 9 to July 14, 2001 and July 18, 2001. Plaintiff attended the library all seven (7) days. *Id.* at ¶ 10.[9] Plaintiff was also placed on the law library list for July 23 through July 28, 2001; however, plaintiff only attended the law library on July 23 and July 24, 2001. *Id.*

Plaintiff was transferred to Sussex I State Prison on July 25, 2001, making him unable to attend the Nottoway Correctional Center law library after those dates. Aff. Kelly ¶ 11.

### 2. Sussex I State Prison

Plaintiff arrived at Sussex I State Prison on July 25, 2001. On July 27, 2001, plaintiff submitted an informal complaint requesting to attend the law library. Plaintiff was granted library access on July 31, 2001, from 12:30 p.m. to 3:45 p.m. and on August 1, 2001 from 2:00 p.m. to 3:45 p.m. Aff. P. True ¶¶ 4 and 6.

Plaintiff submitted another informal request for library access on August 5, 2001, complaining that he had not been given enough library time to complete his legal work. Plaintiff was sent a response indicating that he would be sent to the library within the week. *Id.* ¶ 5.

On August 9, 2001, plaintiff submitted an informal request to defendant Page True ("True") requesting additional library time and complaining that he had only been given one hour in the library, which was too short to re-type his documents.

---

**7.** *See also,* accompanying Exhibits 2 & 3.

**8.** *See also* copy of the Law Library List and Law Library Sign–In Sheet, Aff. Kelly, Enclosures with regard to all dates plaintiff attended the Law Library.

**9.** Plaintiff, however, contends that someone forged his signature on the July 14, 2001, Law Library Sign–In Sheet. Pl's Resp. Br. ¶ 20.

In his response to plaintiff, True advised plaintiff that courts do not mandate that documents be typewritten, and inmates are not permitted access to the law library for typing purposes, access was for library research. *Id.* ¶ 6.

Plaintiff had access to the law library for one (1) to three (3) hours per day for the following days: August 10, August 24, August 31, September 7, October 5, and October 12, 2001. Aff. True ¶ 7.[10]

On June 19, 2002, plaintiff filed a complaint concerning access to the law library and his inability to gain access because the prison was on lockdown. The response to his complaint informed plaintiff that the library had been closed, because all prison programs had been temporarily suspended, due to a quarterly lockdown that began on June 17, 2002. Pl.'s Resp. Br. ¶ 98.[11]

Plaintiff was transferred back to Nottoway Correctional Center on June 26, 2002.

### 3. Nottoway Correctional Center

On June 26, 2002, when plaintiff was transferred to Nottoway Correctional Center, he submitted an informal request asking for access to the law library. Plaintiff was informed that his name would be posted on the Master Pass List for a scheduled date to attend the law library. Aff. J. Terry ¶ 4. Plaintiff also submitted additional informal requests from library time on the following days: July 3, 2002, August 22, 2002, and September 6, 2002. Each time, plaintiff was told that his name would be added to the Master Pass List. *Id.* ¶¶ 5–7.

Plaintiff was granted access and attended the prison library for three (3) to five (5) hours on each of the following dates: July 12, July 13, July 22, July 23, September 9, September 13, September 16, October 23, and October 24, 2002. *Id.* ¶ 8.

### C. Strip Search

The undisputed record shows that as part of the prison intake process, when plaintiff was first transferred to Sussex I State Prison, he was directed by defendant Officer Smith ("Smith") to strip out of his clothes during a routine search. Two female nurses were present when plaintiff was stripped and searched, having already been present in the room in order to perform a routine medical examination of plaintiff. Pl.'s Compl. p. 15.

### D. Firing from Legal Clerk Job

Plaintiff was hired as a law clerk in Nottoway Correctional Center's library. Prior to his hiring, plaintiff was warned not to use the law library computer or discs for his personal use. It is undisputed that, on July 31, 2002, plaintiff was discovered saving documents regarding his personal legal cases on a library computer's hard drive; thus, plaintiff was fired for his misuse of the computer. Pl.'s Am. Compl. ¶ 21; Pl.'s Resp. Br. ¶¶ 106–09; *see also* Aff. Terry ¶ 9.

### III. Legal Standards

### A. Motion to Dismiss Standard

▉ In construing a motion to dismiss, the facts alleged in plaintiff's *pro se* complaint must be taken as true. *Loe v. Armistead,* 582 F.2d 1291, 1292 (4th Cir. 1978). A *pro se* complaint, no matter how unartfully pleaded, must survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Haines v. Kerner,* 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). A *pro se* complaint involving civil rights issues should

---

**10.** *See also* Law Library Schedules accompanying Affidavit of P. True.

**11.** *See also. id.* Ex. 47 (inmate grievance form).

be liberally construed. *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir.1978). Dismissal may be appropriate where the complaint contains a detailed description of underlying facts which fail to state a viable claim. *Estelle v. Gamble*, 429 U.S. 97, 106–09, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). However, where the complaint is broad, dismissal for failure to state a claim is improper. *Bolding v. Holshouser*, 575 F.2d 461 (4th Cir.1978). Finally, where a *pro se* complaint contains a potentially cognizable claim, plaintiff should be allowed to particularize the claim. *Coleman v. Peyton*, 340 F.2d 603, 604 (4th Cir.1965).

### B. Summary Judgment Standard

Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Terry's Floor Fashions v. Burlington Indus.*, 763 F.2d 604, 610 (4th Cir.1985). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. *Celotex Corp.*, 477 U.S. at 322–24, 106 S.Ct. 2548. Such facts must be presented in the form of exhibits and sworn affidavits. Failure by plaintiff to rebut defendants' motion with such evidence on his behalf will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

A mere scintilla of evidence is not sufficient to withstand a motion for summary judgment. Rather, the evidence must be such that the fact-finder reasonably could find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the court must draw all justifiable inferences in favor of the nonmoving party, in order to successfully defeat a motion for summary judgment, a nonmoving party cannot rely on "mere belief or conjecture, or the allegations and denials contained in his pleadings." *Doyle v. Sentry Ins.*, 877 F.Supp. 1002, 1005 (E.D.Va.1995) (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548).

### IV. Analysis of Plaintiff's Claims

Because plaintiff has failed to meet his burdens required under a motion to dismiss or his burdens required under a motion for summary judgment, the court **GRANTS** defendants' motions to dismiss and motions for summary judgment.

### A. Eighth Amendment Claims

#### 1. Eighth Amendment Standard

##### a. Generally

To prove a violation of the Eighth Amendment, made applicable to the States by the Fourteenth Amendment, a prisoner must prove the following two elements:

(1) that objectively the deprivation of a basic human need was "sufficiently serious," and

(2) that subjectively the prison officials acted with a "sufficiently culpable state of mind." *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir.1998); *see also Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir.1991). An inmate must produce evidence of a

serious or significant physical or emotional injury resulting from the challenged conditions. *Strickler v. Waters,* 989 F.2d 1375, 1380–81 (4th Cir.1993). Additionally, it must be shown that prison officials knew of and disregarded the excessive risk to inmate health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

The first prong, which is an objective inquiry, asks whether the deprivation alleged is "sufficiently serious." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970; *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The inmate must be denied "the minimal civilized measure of life's necessities," *Wilson,* 501 U.S. at 298, 111 S.Ct. 2321, and the deprivation must violate contemporary notions of decency. *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (permitting some conditions that may be restrictive and even harsh as part of the penalty that criminal defendants must pay for their offenses against society).

The second prong, a subjective inquiry, requires the inmate to demonstrate that the prison officials acted at least with deliberate indifference toward his or her needs. *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970; *Wilson,* 501 U.S. at 302–03, 111 S.Ct. 2321. This subjective prong requires more than negligent conduct; deliberate indifference exists when a prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 835–37, 114 S.Ct. 1970 (establishing a subjective recklessness standard for prison-condition cases); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Additionally, plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged cruel and unusual prison conditions. *Strickler,* 989 F.2d at 1380–81.

Furthermore, a prison inmate may not bring a federal civil action for a mental or emotional injury suffered while in custody without a prior showing of a physical injury. 42 U.S.C. § 1997e(e).

### b. Inadequate Medical Attention

The standard for inadequate medical attention is deliberate indifference to a serious medical need of a prisoner. *See Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A "serious" medical need exists when failure to treat a prisoner's serious condition will result in significant injury or "unnecessary and wanton infliction of pain." *Id.* Prison officials are considered to have acted with deliberate indifference if they know of and disregard an excessive risk to an inmate's health or safety. *See Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. Specifically, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* This indifference can be manifested by prison guards who intentionally deny or delay access to medical care or by prison doctors in their response, or lack thereof, to a prisoner's needs. *Estelle,* 429 U.S. at 104, 97 S.Ct. 285.

Furthermore, mere disagreements between an inmate and a physician concerning the proper medical care required of an inmate do not constitute a claim under § 1983, unless exceptional circumstances are alleged. *See Wright v. Collins,* 766 F.2d 841, 849 (4th Cir.1985) (citing *Gittlemacker v. Prasse,* 428 F.2d 1 (3d Cir.1970)).

### 2. Analysis

#### a. Claims Against Defendant Johns

Dr. Sonja Johns ("Johns"), a physician at Deep Meadow Correctional Cen-

ter, argues in her motion to dismiss, that because plaintiff raised no allegations against her, plaintiff has failed to state a claim. In neither plaintiff's original nor amended complaint does plaintiff present any claims against defendant. The only mention of Johns, other than to explain that she was a physician at Deep Meadows Correctional Center, is in plaintiff's response to defendants' motion to dismiss, filed May 14, 2003. Plaintiff provided a notarized affidavit certifying under oath that all the facts in his response to defendants' motion to dismiss were true and correct, and plaintiff's response was submitted before any defendants had filed answers to plaintiff's complaint.

Under Rule 15(a) of the Federal Rules of Civil Procedure, plaintiff may amend his pleading "once as a matter of course at any time before a responsive pleading is served." Once a responsive pleading is served, however, a party may amend "only by leave of court or by written consent of the adverse party." Rule 15(a). Rule 7(a) lists those submissions that are considered responsive pleadings,[12] the most common of which is the answer. Under Rule 7, motions are not considered responsive pleadings. *See Smith v. Blackledge,* 451 F.2d 1201, 1203 n. 2 (4th Cir.1971) (holding a motion to dismiss is not a responsive pleading); *Clardy v. Duke Univ.,* 299 F.2d 368, 369 (4th Cir.1962) (holding a motion for summary judgment is not a responsive pleading); *Manning v. Greensville Mem. Hosp.,* 470 F.Supp. 662, 671–72 (E.D.Va. 1979).

Although no defendants filed responsive pleadings before plaintiff filed his response with claims against Johns, on January 27, 2003, plaintiff had previously asked the court for permission to amend his complaint. By order filed February 6, 2003, the court granted plaintiff's motion to amend his complaint and add new parties and claims. Although plaintiff has already "once as a matter of course" filed an amended complaint, the court has a duty to be solicitous when handling *pro se* civil rights actions. *Gordon v. Leeke,* 574 F.2d 1147, 1152–53 (4th Cir.1978). Accordingly, the court shall review plaintiff's response to determine whether he has presented cognizable claims against Johns and should be granted leave to amend his complaint.

Plaintiff's May 14, 2003, response asserts that Johns should have known that plaintiff suffered from low back pain and diabetes because this information had been provided in plaintiff's medical record, which accompanied him when he was first incarcerated at Deep Meadow Correctional Center on May 16, 2001. "Pl.'s Resp. Opposing to the Def.'s Mot. to Dismiss", p. 11. Plaintiff claims that Johns' routine testing of his blood sugar demonstrated that Johns knew plaintiff had diabetes. Plaintiff alleges that despite Johns knowledge that plaintiff suffered from diabetes and low back pain, Johns failed to note such in plaintiff's medical record; therefore, the physicians at Sussex I State Prison were unaware of the treatment plaintiff required when he was transferred from Deep Meadow Correctional Center to Sussex I State Prison. *Id.* Plaintiff does not allege that Johns denied him adequate medical care or otherwise violated his constitutional rights. Furthermore, plaintiff does not assert that he suffered any serious injury as a result of Johns' actions. Because plaintiff has not claimed a serious or significant physical injury resulting

---

12. Rule 7(a) reads as follows:
(a) Pleadings. There shall be a complaint and an answer; a reply to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint, if a person who was not an original party is summoned under the provisions of rule 14; and a third-party answer, if a third-party complaint is served . . . .

from defendants' actions, the court finds that plaintiff has failed to allege an Eighth Amendment violation that would entitle him relief.

Because plaintiff has still made no cognizable claims against Johns in his May 14, 2003, response, the court shall not grant plaintiff leave to amend his complaint.

### b. Claims Against Defendant Thompson

 In plaintiff's amended complaint filed January 27, 2003, plaintiff alleges that defendant L. Thompson ("Thompson") failed to "follow[ ] the proper standard medical procedure that's require[sic] by the medical policy." Pl.'s Am. Compl. ¶ 54. Plaintiff does not explain or allege how defendant Thompson violated his constitutional rights, nor does plaintiff allege that Thompson denied him medical treatment or was deliberately indifferent to his serious medical needs. The only other mention of Thompson in plaintiff's complaint is that Thompson questioned plaintiff about his health condition. Pl.'s Compl. ¶ 60. In plaintiff's response brief, plaintiff has a section entitled "Plaintiff's Claim Against Dr. L. Thompson;" however, plaintiff makes no allegations in this section against defendant Thompson. Instead, plaintiff only alleges that he filed numerous complaints in order to determine the identity of the doctor who diagnosed him with high blood pressure. Plaintiff does not allege that Thompson in any manner violated plaintiff's constitutional rights. Accordingly, plaintiff has failed to state a cognizable § 1983 claim against defendant Thompson.

### c. Claims Against Defendant Wiley

 In his complaint, plaintiff alleges that Wiley "was already up-set[sic] for being late for work" and directed Sergeant Porter to place plaintiff in the "Sick Housing Unit" ("SHU") because plaintiff was unable to walk. Pl.'s Compl. ¶¶ 14–15. Plaintiff contends that Sergeant Porter put him in Cell # 10, which was dirty and did not have running water. When plaintiff complained of the cell's condition, Sergeant Porter informed plaintiff that he would place a work order to have plaintiff's water fixed. *Id.* at ¶ 15. Plaintiff does not allege that Wiley was responsible for placing plaintiff in the cell nor does he allege that Wiley caused plaintiff any injury.

 Even after construing the facts of plaintiff's complaint as true, plaintiff has failed to state a claim against Wiley. Defendant Wiley's act of directing Sergeant Porter to place plaintiff in the SHU because plaintiff was unable to walk does not constitute a constitutional violation. Assuming *arguendo* that plaintiff alleged Wiley was responsible for placing plaintiff in the dirty cell without running water, such action would not rise to the level of a constitutional violation. Plaintiff does not allege that he suffered any harm from being placed in the allegedly dirty SHU cell. Because plaintiff has not claimed a serious or significant physical injury resulting from defendants' actions, the court finds that plaintiff has failed to allege an Eighth Amendment violation that would entitle him to monetary relief. At most, he would be entitled to injunctive relief. A prisoner may obtain injunctive relief "to prevent a substantial risk of serious injury from ripening into actual harm" if the prisoner is able to establish that the prison personnel were, and are continuing, to "knowingly and unreasonably disregard[ ] an objectively intolerable risk of harm." *Farmer v. Brennan*, 511 U.S. 825, 845–46, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Here, however, the court finds that injunctive relief is not an appropriate remedy. The appropriate injunctive remedy for holding plaintiff in an allegedly dirty cell would be to release plaintiff; plaintiff has already been released. Because plaintiff is no longer confined in segregation, any claims for injunctive relief are **MOOT**.

#### d. Claims Against Defendant Tyler

 Plaintiff sues defendant Ms. T. Tyler ("Tyler") in her capacity as the medical administrator of Sussex I State Prison and for the manner in which she handled plaintiff's grievances. Plaintiff alleges that he submitted a request to Tyler for a copy of his medical record. Plaintiff claims that he received a response indicating that his request was not filled out properly. Pl.'s Compl. p. 27. Additionally, plaintiff contends that he filed complaints against the prison's medical department with Tyler. *Id.* at p. 28.[13] Plaintiff does not claim that Tyler, as the medical administrator, was either personally involved in denying him adequate medical care or personally responsible for a policy that denied him adequate medical care; he merely alleges Tyler was responsible because she supervised the prison's medical department. Section 1983 liability is personal in nature. The doctrine of *respondeat superior* does not apply to hold an employer or supervisor liable for the acts of his employee. *See Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Vinnedge v. Gibbs,* 550 F.2d 926, 928 (4th Cir.1977). Because plaintiff does not allege that Tyler was personally involved in a wrongful act or that an alleged wrongful act occurred pursuant to some official policy or custom for which she was responsible, Tyler cannot be held liable for the alleged denial of adequate medical care to plaintiff. *Fisher v. Washington Metro. Area Transit Auth.,* 690 F.2d 1133, 1142–43 (4th Cir.1982); *see also Monell,* 436 U.S. at 694, 98 S.Ct. 2018, 56 L.Ed.2d 611; *Vinnedge,* 550 F.2d at 928.

#### e. Claims Against Defendant Moore

 Plaintiff alleges that defendant Dr. Moore ("Moore"), assistant warden of Sussex I State Prison, told plaintiff that he would be interviewed by a nurse and placed on a wait list to see a doctor, after plaintiff had requested a visit with an institutional doctor rather than a nurse. Plaintiff makes no other allegations against Moore. Plaintiff does not allege that Moore, who is not a medical doctor, knew of or disregarded plaintiff's serious medical needs. Instead plaintiff explains that Moore informed him that he would be placed on the waiting list to be seen by a doctor. The undisputed record shows the standard protocol of Sussex I State Prison requires that an inmate requesting non-emergency medical care be seen initially by a prison nurse, prior to being scheduled for an examination by the institutional physician. In attempting to obtain medical care for plaintiff, Moore followed standard protocol and scheduled an appointment for plaintiff with a nurse and prison doctor. Assuming *arguendo* that plaintiff had serious medical needs, no evidence in the record shows Moore was deliberately indifferent to plaintiff's serious medical needs.

#### f. Claims Against Defendant Wilson

 Plaintiff claims that defendant Wilson failed to provide him adequate medical care, because Wilson failed to treat plaintiff's diabetic condition and back pain. Assuming *arguendo* that plaintiff had serious medical needs, no evidence in the record demonstrates that Wilson was deliberately indifferent to these needs. On the contrary, the record shows that Wilson provided plaintiff with extensive medical care and attention, in efforts to address plaintiff's medical needs. After diagnosing plaintiff with Type II diabetes,[14] Wilson

---

**13.** Dismissal of plaintiff's claims against Tyler with regard to her handling of plaintiff's grievances shall be discussed below in the section D entitled "Grievance Claims."

**14.** Plaintiff contends that he had been diag-

prescribed Glucotrol for plaintiff to treat plaintiff's condition. Wilson also ordered that plaintiff's blood sugar be checked two (2) times per day for 180 days, to monitor the medication's effectiveness. Even after determining that plaintiff's diabetic condition was "well-controlled," Wilson continued plaintiff on Glucotrol to maintain his condition. In efforts to treat plaintiff's back pain, Wilson initially prescribed increased dosages of Motrin to plaintiff. Wilson later decreased plaintiff's Motrin dosage to prevent plaintiff from developing a gastric ulcer. After Wilson realized that the Motrin was failing to relieve plaintiff's alleged back pain, he prescribed Robaxin, a muscle relaxant, to plaintiff and provided plaintiff with a list of exercises that he could perform to improve the condition of his back and to alleviate back pain. Later, Wilson performed a complete neurological exam of plaintiff, to determine the cause of plaintiff's recurrent complaints of back pain.

At most, plaintiff appears to disagree with Wilson's method in treating plaintiff's medical conditions. Plaintiff complains that Wilson discontinued plaintiff's prescription for the increased dosage of Motrin. Plaintiff also expresses dissatisfaction with Wilson's treatment for his diabetes. Plaintiff fails to allege any exceptional circumstances that would satisfy the standard for deliberate indifference to his serious medical needs; and therefore, the court determines that plaintiff has merely presented a disagreement in medical care, which does not constitute a claim under § 1983. *See Wright,* 766 F.2d at 849.

### 3. Conclusion

For the aforementioned reasons, the court determines that plaintiff has failed to state a cognizable § 1983 claim against

defendants Thompson, Johns, and Wiley. Accordingly, the court hereby **GRANTS** defendants' motions to dismiss. Additionally, the court finds that no evidence in the record could reasonably allow a fact-finder to conclude that plaintiff's Eighth Amendment rights have been violated.

## B. Sixth Amendment Claims: Denied Access to Institutional Law Libraries

### 1. Sixth Amendment Standard

Although prisoners maintain a right of access to the courts, they do not have the right of access to a law library. *See Strickler,* 989 F.2d at 1385 *(citing Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). A prisoner has not been denied his right of access to the courts simply because an institution's library is inadequate or because a prisoner's access to that library has been restricted in some way. *See id.* The right to access the court "does not guarantee [prisoners] the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 2182, 135 L.Ed.2d 606 (1996). Furthermore, an actual injury is required to state a claim for denial of access to the courts. *See id.* at 2181. It is a basic requirement that the prisoner asserting the claim show specific harm or prejudice from the allegedly denied access. *See Strickler,* 989 F.2d at 1384; *see also Inmates v. Owens,* 561 F.2d 560, 562–63 (4th Cir.1977). The injury requirement is not satisfied by just any type of frustrated legal claim; the prisoner must demonstrate that his nonfrivolous, post-conviction or civil rights legal claim has been frus-

---

nosed with diabetes prior to Wilson's diagnosis; however, there is no evidence in plain-

tiff's medical record of such.

trated or impeded. *See Lewis,* 116 S.Ct. at 2181. Where a prisoner "has been accorded his right of access to the courts, [the courts] are simply without authority to adjudicate an abstract complaint about the library's adequacy or [the prisoner's] access to the library." *Strickler,* 989 F.2d at 1385.

█ Access to a prison's law library may be restricted during prison lockdown where inmates have access to other forms of legal advice. *See Johnson v. Williams,* 768 F.Supp. 1161 (E.D.Va.1991).

### 2. Analysis

█ Plaintiff alleges he missed court filing deadlines because he was denied adequate access to prison law libraries. Plaintiff also complains that he had no access to the library when the prison was on lockdown status.

The record presents no evidence that plaintiff was denied access to the any prison law libraries. Instead, undisputed evidence demonstrates that plaintiff had several visits to the law libraries in both Sussex I State Prison and Nottoway Correctional Center, often lasting several hours. Additionally, Nottoway Correctional Center has a court appointed attorney to assist inmates. Pl.'s Resp. Br. p. 35. Plaintiff received legal assistance from the institutional attorney. *See e.g.,* Pl.'s Am. Complaint ¶ 37. The only time plaintiff was denied library access was when the law library at Nottoway Correctional Center was closed because the prison had been placed on lockdown. Pl.'s Resp. Br. ¶ 98. There is no indication that plaintiff could not contact the prison's institutional attorney for legal assistance while the prison was on lockdown. *See Johnson,* 768

F.Supp. 1161 (holding that access to a prison law library may be restricted during lockdown as long as inmates have access to legal advice).

█ Plaintiff also claims that defendant Ms. J. Terry ("Terry"), the law librarian at Nottoway Correctional Center, violated his constitutional rights, because she failed to provide him legal assistance when he was visiting the library. Pl.'s Resp. Br. p. 35. States have a duty to provide inmates with *either* an attorney or access to law libraries to prepare for trial. *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). States need not provide both law libraries and advisors. *Smith,* 813 F.2d at 1302 ("either remedy, law libraries or attorney assistance, could fulfill the constitutional right of access [to the courts]"); *Williams,* 584 F.2d 1336. The evidence shows that plaintiff had extensive time in the law library. Additionally, plaintiff admits that the prison had a court appointed attorney to assist inmates, who visited plaintiff. Pl.'s Am. Compl. ¶ 37.

### 3. Conclusion

No evidence in the record supports plaintiff's allegation that plaintiff was unconstitutionally denied access to law libraries. Therefore, plaintiff has not established how he has been denied his constitutional right of access to the courts.[15]

### C. Fourth Amendment: Privacy in Genitalia

#### 1. Fourth Amendment Standard

In *Lee v. Downs,* 641 F.2d 1117 (4th Cir.1981), the Fourth Circuit affirmed the

---

**15.** Defendant Terry is the only defendant who plaintiff alleges prevented him from attending the law library. Plaintiff's other library claims are all against defendants who allegedly did not handle plaintiff's grievances in a manner to plaintiff's liking. Claims regarding defendants' handling of plaintiff's grievances shall be addressed in section D, entitled "Grievance Claims."

district court's decision that although a prisoner surrenders some rights of privacy, all privacy rights are not extinguished. The court held that involuntary exposure of a female prisoner's genitalia to male guards violated the special right of privacy the inmate had in her genitalia. Courts have also found a violation of a prisoner's special right to privacy in instances where male guards were stationed in rooms with female prisoners who were required to undress for medical examinations. *See e.g., Lee*, 641 F.2d at 1120 (citing *Forts v. Ward*, 471 F.Supp. 1095 (S.D.N.Y.1978)) (finding that the presence of male guards unnecessary where female prisoner undressed for a medical examination).

Although, most courts have condemned strip searches conducted by prison personnel of the opposite sex, except in the most extreme of circumstances, courts do not find strip searches conducted by medical personnel of the opposite sex as similarly reprehensible. In *Skurstenis v. Jones*, 236 F.3d 678, 683–84 (11th Cir.2000), the Eleventh Circuit examined whether strip searches performed on prison inmates by medical personnel of the opposite sex were constitutional, realizing that there had been no discussion amongst the Circuits as to such. *Id.* Discussion of strip searches performed by medical personnel has merely been to purport that body cavity and rectal searches should be performed by medical, not jail, personnel; "[t]he sex of a medical person conducting the search is either not identified or is mentioned only for informational purposes." *Id.* (citing *Torres v. Wisconsin Dept. of Health and Soc. Servs.*, 859 F.2d 1523 (7th Cir.1988) (en banc); *Bonitz v. Fair*, 804 F.2d 164 (1st Cir.1986); *Daughtery v. Harris*, 476 F.2d 292, (10th Cir.1973); *Tribble v. Gardner*, 860 F.2d 321 (9th Cir.1988); *Hurley v. Ward*, 584 F.2d 609 (2d Cir.1978)); *see also Snider v. Hughes*, 59 F.3d 167 (4th Cir.1995).

In *Skurstenis*, the court held that it was not inappropriate for medical personnel to conduct strip searches on inmates of the opposite sex, and such action does not violate inmates' constitutional rights. *Skurstenis*, 236 F.3d at 684. Although other courts have not directly addressed the issue of whether strip searches, including rectal searches, performed on inmates by medical personnel of the opposite sex are constitutional, courts have found no privacy issue in cases where such searches are performed on inmates by medical personnel of the opposite sex. *See e.g., Laughter v. Kay*, 986 F.Supp. 1362 (D.Utah 1997) (describing that a male physician performed a rectal search on a female inmate, but not raising an issue as to whether the inmate's right to privacy had been violated).

The dearth of cases on the issue of whether medical personnel may perform strip searches on inmates of the opposite sex and the fact that when these types of searches are performed no such issue is raised suggests that strip searches conducted on inmates by medical personnel of the opposite sex do not violate prisoners' constitutional rights.

### 2. Analysis

Plaintiff alleges that Smith violated his constitutional right to privacy when he performed a routine strip search, during prison intake, and ordered plaintiff to strip in the presence of two qualified female nurses. Pl.'s Compl. ¶¶ 9–10, p. 15. Plaintiff asserts that the female nurses entered the intake area, prior to the search, in order to perform a standard medical examination of plaintiff. *Id.* ¶ 3, p. 14. Plaintiff also claims that he was made to squat and cough before the nurses. *Id.* ¶ 10, p. 16. Plaintiff contends that he informed Smith that the two female nurses were present, to which Smith responded

"its[sic] nothing that they never seen." Pl.'s Resp. Br. p. 28.

 Although courts have found that involuntary exposure of a female prisoner's genitalia to male guards violated the special right of a prisoner's privacy in her genitalia, here, plaintiff merely alleges that Smith made him strip and a rectal search was performed on him, while in presence of two qualified female nurses. Plaintiff does not allege that female guards or other female prison personnel were present. Generally, rectal searches are distinguished from regular strip searches and are required to be conducted by trained medical professionals. *See e.g., Daughtery,* 476 F.2d 292 (upholding rectal searches performed by "paraprofessional medical assistants" and forbidding such searches by ordinary prison personnel); *see also Tribble,* 860 F.2d 321; *Snider,* 59 F.3d 167. Therefore, the presence of nurses during a routine anal search is common, if not necessary. Male and female medical professionals customarily examine individuals of the opposite sex, and such behavior has not been found to constitute a constitutional violation. Plaintiff does not allege that he notified the nurses or Smith that he did not want to be examined by or searched in the presence of female nurses. Moreover, plaintiff explains, "The plaintiff wasn't about to refuse Officer Smith[sic] demand." If plaintiff had a special sensitivity to being examined by qualified female nurses, it was his duty to notify Smith or the female nurses. Because the presence of trained medical personnel of the opposite sex during a reasonable routine strip and anal search of an inmate is not constitutionally inappropriate, Smith's actions could not violate plaintiff's constitutional rights.

### 3. Conclusion

For the aforementioned reasons, the court determines that plaintiff has failed to state a cognizable constitutional claim against Smith. There is no evidence that plaintiff's special right to privacy in his genitalia has been violated.

## D. Grievance Claims

### 1. Standard

 A prisoner does not have a constitutionally protected right to "grievance procedures or access to any grievance procedure voluntarily established by a state." *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir. 1994).

### 2. Analysis

 The court determines that dismissal of plaintiff's complaint with regard to defendants Ms. D. Graham ("Graham"), Ms. N. Matthews ("Matthews"), Ms. K. Fowlkes ("Fowlkes"), and Mr. Rufus Fleming ("Fleming"), in addition to claims concerning the handling of plaintiff's grievances by defendants True and Tyler, is appropriate because plaintiff fails to state a claim upon which relief can be granted. Plaintiff only alleges that defendants Graham, Matthews, Fowlkes, and Fleming violated his constitutional rights in their manner of handling his grievances. Plaintiff further contends that Matthews violated his constitutional rights and hindered his ability to proceed through the grievance process, because she rejected plaintiff's complaints that did not adhere to the rules for filing inmate grievances. Pl.'s Am. Complaint ¶ 49. Plaintiff was dissatisfied with the manner in which these defendants handled his complaints, including being dissatisfied with their determinations that his grievances were "unfounded." *Eg.,* Pl.'s Compl. and Pl.'s Resp. Br. (referring to defendant True).

Because plaintiff has no right of access to any grievance procedures, even assuming that defendants did not answer plaintiff's grievances in a "timely manner" or

plaintiff's ability to proceed through the grievance process was delayed, defendants' actions would not establish constitutional violations. Plaintiff's complaint regarding these defendants simply does not rise to a level of constitutional significance.

### 3. Conclusion

With regard to plaintiff's complaints that defendants did not handle his grievances appropriately plaintiff has failed to state a claim upon which relief can be granted.

### E. Miscellaneous Claims

■ The only remaining claim against defendant Terry is an allegation that plaintiff's constitutional rights were violated because Terry fired plaintiff from his job after plaintiff misused the law library's equipment and resources for his own personal use, even though plaintiff was forewarned that such use was prohibited. Prisoners do not have a constitutional right to work assignments. *See Gaston v. Taylor,* 946 F.2d 340 (4th Cir.1991) (en banc). Accordingly, plaintiff has failed to state a claim against Terry.

Plaintiff has made a variety of other claims, including the following: (1) his daughter did not receive the M & M candies he mailed her; (2) there was a 43 day delay before correspondents received mail that plaintiff sent from the prison; .(3) plaintiff was restricted from possessing some of his personal property items because they were unauthorized at the prison; (4) the prison's commissary failed to sell "personal name brand hygiene products"; (5)prisoners were provided inadequate winter clothing; (6) prison lights were not completely turned off at night; (7) plaintiff was unable to attend religious services of Jumu'ah because his name was still on a waiting list to attend such services; and (8) plaintiff did not receive requested religious materials. Plaintiff only raises these claims in regard to defendants who allegedly did not address his grievances. As discussed, a prisoner does not have a constitutionally protected right to grievance procedures.

### F. Claims that Defendants are Responsible for their Subordinates

■ Plaintiff only sues defendants Mr David Robinson ("Robinson") and Mr. W.P. Rogers ("Rogers") for their supervision of other defendants. Plaintiff's claims against Moore and True include allegations that these defendants violated plaintiff's constitutional rights because they supervised prison employees, including other defendants. Because there is no evidence that plaintiff's constitutional rights have been violated, there are no constitutional violations for which these defendants could be held responsible. Furthermore, § 1983 liability is personal in nature. The doctrine of *respondeat superior* does not apply to hold an employer or supervisor liable for the acts of his employee. *See Monell,* 436 U.S. at 694, 98 S.Ct. 2018; *Vinnedge,* 550 F.2d at 928.

### V. Conclusion

For the aforementioned reasons, plaintiff has failed to state a claim upon which relief could be granted against defendants Thompson, Johns, and Wiley. Therefore, the motion to dismiss filed by defendants Thompson and Johns is **GRANTED** and the motion to dismiss filed by defendant Wiley is **GRANTED**. Additionally, for the aforementioned reasons, the court **GRANTS** the motion for summary judgment filed by defendants Tyler and Wilson and the motion for summary judgment filed by defendants Smith, Fowlkes, True, Graham, Fleming, Robinson, Terry, Matthews, Rogers, and Moore. Accordingly, this action is **DISMISSED**.

Plaintiff is **ADVISED** that he may appeal from this final order by forwarding a written notice of appeal to the Clerk of the

United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia 23510. Said written notice must be received by the Clerk within thirty (30) days from the date of this order. If plaintiff wishes to proceed *in forma pauperis* on appeal, the application to proceed *in forma pauperis* is to be submitted to the Clerk, United States Court of Appeals, Fourth Circuit, 1100 E. Main Street, Richmond, Virginia 23219.

The Clerk is **DIRECTED** to send a copy of this opinion and final order to plaintiff, at his new address in Keen Mountain Correctional Center, and to counsel for defendants.

IT IS SO **ORDERED**.